**CITIZENS ASSOCIATION OF GEORGE-
TOWN et al., Plaintiffs,**

v.

**Walter E. WASHINGTON, Commissioner
of the District of Columbia, et al.,
Defendants.**

**Civ. A. No. 1944–73.**

United States District Court,
District of Columbia.

Aug. 8, 1974.

On Motion for Attorneys' Fees and Costs
Sept. 30, 1974.

See also D.C., 370 F.Supp. 1101.

Bruce J. Terris, Suellen T. Keiner, Washington, D. C., for plaintiffs.

John C. Salyer, III, David S. Eisenberg, Asst. Corp. Counsel, Washington, D. C., for defendants.

Charles J. Steele, Jo V. Morgan, John J. Carmody, Jr., Washington, D. C., for Maloney Concrete Co.

Burton A. Schwalb, Washington, D. C., for the Georgetown-Inland Corporations.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION

This action came on for trial on the merits before the Court sitting without a jury. Plaintiffs, Citizens Association of Georgetown and The Committee of 100 on the Federal City, seek a declaratory judgment and injunctive relief in order to prevent the completion of two buildings in the Georgetown waterfront area of the District of Columbia. The issues presented are whether the corporate Defendants are in violation of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 1857 et seq. (1969), as amended (Supp.1974), and whether the corporate Defendants' developments will cause a violation of the national ambient air quality standards in 1977. The Court finds that the Plaintiffs failed to show that Defendants are in violation of any "emission standard or limitation" under the Act

and further that Plaintiffs failed to prove at trial that Defendants, Georgetown-Inland North Corporation and Maloney Concrete Company, will cause a violation of the national primary ambient air quality standards in 1977 by completing their projects in accordance with existing permits.

This opinion constitutes the Court's findings of fact and conclusions of law as required by Federal Rules of Civil Procedure 52(a).

## II. THE PARTIES

Plaintiff, Citizens Association of Georgetown, a non-profit group founded in 1878, has a long history of fighting to preserve the historical, scenic, and national values of this city and its environment. It sues here on behalf of its members as well as itself.

Plaintiff, The Committee of 100 on the Federal City, is a non-profit group founded in 1923 which seeks to promote sound land-use planning techniques and, generally, to make the nation's capitol a better place in which to live. It sues on behalf of its members and itself. It alleges that several of its members own property in the Georgetown area and claims that members of the Committee will be seriously injured by the increase in air pollution which will allegedly be produced in the Washington area by the construction of Defendants, Maloney Concrete Company and the Georgetown-Inland Corporation.

■ Plaintiffs have standing to prosecute this action since the alleged detriment to their health and the potential loss to Defendants, were Plaintiffs to succeed in this suit, exceed $10,000.

The local governmental defendants are the Commissioner of the District of Columbia, Walter E. Washington; the Director of the D. C. Department of Economic Development, Julian R. Dugas; and the Acting Director of the D. C. Department of Environmental Services, William C. McKinney. These Defendants have the authority and responsibility under the Clean Air Act (42 U.S.C. § 1857 et seq.), the District of Columbia Air Pollution Control Act (D.C. Code 6–811 et seq.), and regulations promulgated thereunder, to prepare a comprehensive program to control and prevent air pollution in the District of Columbia.

The corporate Defendants are the Georgetown-Inland Corporations and the Maloney Concrete Company. The Georgetown-Inland Corporations are five affiliates of Inland Steel Corporation. These corporations have plans over the next five years to construct in three phases an $80 million complex consisting of shops, restaurants, offices, a hotel, and a conference center on a seven-acre site in the Georgetown waterfront area. Among the five Inland affiliates, only Georgetown-Inland North Corporation has a building permit and is in the process of construction. Its building will be all-electric and will contain offices, shops, and a parking garage. The Maloney Concrete Company, a Delaware corporation, is the owner and developer of the Dodge Center, a complex of offices, shops and garage, now under construction in the Georgetown waterfront area.

## III. JURISDICTION OF THIS COURT

■ This Court has jurisdiction to hear this action under 42 U.S.C. § 1857h–2(a) and 28 U.S.C. § 1331(a).[1] 42 U.S.C. § 1857h–2(a) vests in this Court jurisdiction of "citizens suits" wherein any person is alleged to be in violation of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 1857 et seq. Plaintiffs have alleged in their complaint that construction by the corporate Defendants will preclude the attainment of the national primary ambient air quality standards for the District of Columbia in 1977. This is the precise issue on which the parties went to trial after denial of the

---

1. The Court has reconsidered its ruling of the jurisdictional issue since its decision on the preliminary injunction.

Plaintiffs' motion for a preliminary injunction. Citizens Ass'n of Georgetown v. Washington, 370 F.Supp. 1101 (D.D. C.1974). Plaintiffs also allege that the corporate defendants are in violation of D.C.R.R. 8–2:720(a) which requires that construction of any "stationary source" of air pollution proceed only upon issuance of an air quality permit. Upon consideration of the Clean Air Act and upon our construction of the Act, we have concluded that Plaintiffs fail to demonstrate that Defendants are in violation of any "emission standard or limitation" as defined by the Clean Air Act. However, this decision calls for a judgment on the merits rather than a dismissal for want of jurisdiction.

■ 42 U.S.C. § 1857h–2(a) extends . federal court jurisdiction to cases not otherwise cognizable, without excluding jurisdiction provided by other provisions. 42 U.S.C. § 1857h–2(e). The im-' portance of § 1857h–2(a) as a jurisdictional provision is that it confers *federal* jurisdiction over violations of "emission limitations" even if those standards are only proscribed by state or local statutes, if the state or local statute is part of an implementation plan. Moreover, the potential plaintiff is relieved of meeting the jurisdictional amount of $10,000.00.

The Court also concludes that jurisdiction under 28 U.S.C. § 1331(a) is well-founded. A *substantial federal question* exists as to whether the Clean Air Act *in its entirety* requires that the Maloney and Inland developments be reviewed by a federal district court, prior to or during construction, to determine if construction will interfere with the attainment and maintenance of the national ambient air quality standards in the District by May 31, 1977.

## IV. PLAINTIFFS FAILED TO DEMONSTRATE THAT THE CORPORATE DEFENDANTS VIOLATE THE CLEAN AIR ACT

■ In order to prevail in this case, Plaintiffs must: (1) show that the cor-porate Defendants have violated an "emission standard or limitation" as defined in the Clean Air Act, or a District of Columbia regulation implementing the Act; or (2) demonstrate that Defendants' construction will in fact cause a violation in 1977 of the national ambient air quality standards. We conclude that Plaintiffs have failed in the first respect as a matter of law and in the second respect as a matter of fact. This decision is limited to the buildings now under construction by Georgetown-Inland North Corporation and Maloney Concrete Company. The other Inland developments have not been issued building permits, are at an indefinite stage of planning, and may be subject to District of Columbia or EPA regulations concerning "indirect sources" or parking facilities when construction begins.

*A. The Corporations Are Not in Violation of an "Emission Standard or Limitation" as Defined by the Clean Air Act.*

42 U.S.C. § 1857h–2(a) gives jurisdiction to the federal district court to hear suits in which a party alleges a violation of (1) an "emission standard or limitation under this chapter" or (2) an order issued by a state or the Environmental Protection Agency (hereinafter, "EPA") with respect to such a standard or limitation. The second type of violation (violation of an order) is not in question, so the Court does not need to discuss it here. 42 U.S.C. § 1857h–2(f) defines the terms "emission standard or limitation under this chapter" to mean "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard [or a motor vehicle standard, not applicable here] which is in effect under this chapter . . . or under an applicable implementation plan." All of these terms are "terms of art"; they are defined by Congress within other provisions of the Act as discussed below. These terms have precise definitions under the Act and this Court is not free to add or subtract from their legislative content if it is unambiguous. We will discuss each term in turn.

The terms "emission limitation" and "schedule or timetable of compliance" are defined in 42 U.S.C. § 1857c–5(a)(2)(B). Each state is required to adopt an implementation plan to meet the national primary and secondary air quality standards under § 1857c–5(a)(1). "Emission limitation" is a broad term for those measures within state implementation plans which are necessary to insure attainment and maintenance of the national primary and secondary air quality standards. *See* National Resources Defense Council v. EPA, 489 F.2d 390 (5th Cir. 1974) at note 2. "Schedules or timetables of compliance" are timetables for compliance with the emission limitations, which timetables are also to be found in the implementation plans. 42 U.S.C. § 1857c–5(a)(2)(B). That is, Congress has directed each state to adopt a plan sufficient to meet the national primary and secondary air quality standards. Such a plan must be implemented by state (and perhaps local) statutes establishing standards or rules of conduct to limit emission of harmful pollutants into the air and schedules for meeting those standards. It is these standards and schedules that are referred to in the Act by the terms "emission limitations" and "schedules or timetables of compliance".

Plaintiffs have not alleged that the corporate defendants are in violation of any "emission limitation" or "schedule of compliance" which is provided by any existing District of Columbia statute or regulation. They do allege that the corporations did not comply with D.C.R.R. 8–2:701 et seq., but, as discussed below, that allegation is insufficient as a matter of law.

"Standard of performance" is a more narrow term than "emission limitation" and is defined in 42 U.S.C. § 1857c–6(a)(1) as that degree of emission limitation which the Administrator of EPA establishes for new sources within each category of stationary sources. By definition under the Act, a "standard of performance" can only apply to "new sta-tionary sources". 42 U.S.C. § 1857c–6(a)(2), (b)(1)(B). A "new stationary source" is any "stationary source" (building, structure, facility or installation which emits or may emit any air pollutant) of which construction or modification is commenced after the publication of the regulations which prescribe an applicable standard of performance. 42 U.S.C. § 1857c–6(a)(2), (3). § 1857c–6(e) makes unlawful the operation of any new source in violation of any standard of performance applicable to that source; that is, violation of a standard of performance is a violation of federal law.

The statutory definition of "new source" is not complete; rather, the statute contemplates regulations which establish the "sources" to be regulated and the standards of performance applicable in each case. *See, e. g.,* 42 U.S.C. § 1857c–6(a)(2), (e). No court can judge whether a building is in violation until the regulations are effective. In promulgating regulations which establish rules of conduct, under the stationary source provisions of the Act (42 U.S.C. §§ 1857c–6, 1857c–7), the EPA did not include buildings with garages as a category of "stationary sources". 40 C.F.R. § 60.1 et seq.

The EPA soon recognized that facilities which attract automobiles may not themselves fall within the definition of "stationary source" but could nonetheless endanger attainment of the national standards because of associated automobile activity. Accordingly, EPA regulations concerning implementation plans were modified June 18, 1973, to require state plans to contain "legally enforceable procedures adequate to enable the State or local agency to determine" whether construction of a building would result in a violation of the state "control strategy" or would "interfere with attainment or maintenance of a national standard whether directly, because of emissions from it, or indirectly, because of emissions resulting from mobile source activities associated with it." 40

C.F.R. § 51.18(a). This regulation does not by itself establish any self-executing provisions for such a determination, but directs the state to implement such provisions. Thus, 40 C.F.R. § 51.18(a) requires the District of Columbia to establish review procedures for the construction of "indirect sources". Subsequent regulations effectively exempt the District of Columbia from "indirect source" review. *See* 40 C.F.R. § 52.22(b)(15) at 39 Fed.Reg. 25300 (1974).

On November 15, 1973, EPA promulgated regulations which establish the procedure for reviewing some "indirect sources" in the District. 40 C.F.R. § 52.493 at 38 Fed.Reg. 31536. These regulations establish for the first time a rule of conduct applicable to the construction of certain parking facilities (an "indirect source") in the District. 40 C.F.R. § 52.493(d)–(g). But these regulations only apply to construction or modification of certain parking facilities commenced after November 12, 1973. 40 C.F.R. § 52.493(c) at 38 Fed.Reg. 31537. Since the corporate Defendants' construction was commenced prior to November 13, 1973, these regulations are not applicable to them. This effective date has since been changed to January 1, 1975. 39 Fed.Reg. 1849 (1974).

Therefore, Plaintiffs have failed to show any violation of a "standard of performance" as defined by the Act.

Finally, the term "emission standard" is defined by its use in 42 U.S.C. § 1857c–7(b)–(d) as an emission limitation applicable to a "hazardous air pollutant". A "hazardous air pollutant" is specifically defined as an air pollutant for which *no ambient air quality standard is applicable.* 42 U.S.C. § 1857c–7(a)(1). That is, "emission standard" is a term applicable only to air pollutants for which an air quality standard is *not* in effect. Since Plaintiffs here contend that the Defendants' facilities will emit air pollutants for which air quality standards are in effect, Defendants' facilities cannot be in violation of any "emission standard".

*B.   Plaintiffs Failed to Demonstrate Sufficiently That Inland's and Maloney's Buildings are in Violation of District of Columbia Regulations Applicable to "Stationary Sources" of Pollutants*

Upon reconsideration of all arguments made after this Court's determination of the issues presented by Plaintiffs' motion for preliminary injunction, we conclude that the Defendants Maloney and Inland were not required to obtain stationary source construction permits pursuant to the District of Columbia Air Quality Control Regulations, Title 8, Sec. 2:701 et seq. Their buildings are not "stationary sources" within the meaning of those regulations. *See* Metropolitan Washington Coalition for Clean Air v. Dep't of Economic Dev., 373 F.Supp. 1096 (D.D.C.1974). Thus, Defendants are not in violation of those District regulations.

As discussed above, EPA regulations now require state implementation plans to contain procedures to review *"indirect* sources." However, the District has not implemented such review and the EPA-promulgated regulations applicable to certain "indirect sources" do not apply to the Maloney and Inland projects now under construction. *See* text, *supra,* at page 8.

*C.   The Plaintiffs Failed at Trial to Carry Their Burden of Proof to Establish that the Defendants' Developments will Cause the National Ambient Air Quality Standards to be Exceeded in 1977.*

The national ambient air quality standards which the District of Columbia must meet by May 31, 1977, for carbon monoxide, non-methane hydrocarbons, and photochemical oxidants, are as follows:

| | |
|---|---|
| Carbon Monoxide | 9 p.p.m. 8-hour concentration |
| | 35 p.p.m. 1-hour concentration |
| Photochemical Oxidants | 0.08 p.p.m. 1-hour concentration |
| Non-methane Hydrocarbons | 0.24 p.p.m. 3-hour concentration |

These pollution levels may not be exceeded more than once each year in order to

comply with the federal standards. 40 C.F.R. §§ 50.8–50.11. That is, e. g., during any eight-hour period, the average concentration of carbon monoxide for that period may not exceed 9 parts per million in more than one eight-hour period per year.

Plaintiffs' evidence about the air quality in the Georgetown area in 1977 is speculative, conflicting and inadequate to support a judgment. By necessity, this evidence is primarily opinion subject to conjecture and is based on estimates of vehicular traffic, levels of emissions, and many other factors. Most significantly, Plaintiffs' two experts disagree with one another: Mr. Sullivan testified that the standards would be exceeded in Georgetown even without the new developments, and Mr. Thayer originally testified that the standards would be met without the new buildings.

Prediction of air quality in 1977 is a very complicated task which involves estimation of the quantity of vehicular traffic, quantity of emission from the various types of automobiles, and the routes that the traffic will utilize. Mr. Thayer testified that it is impossible to know whether air quality projections will come true. Based upon the relevant factors, he estimated that the one-hour concentration of carbon monoxide at Wisconsin Avenue and M Street will be 37 p.p.m. in 1977, with a possible error of about 2 p.p.m. Moreover, substantial evidence indicates that proper adjustments to the assumptions on which that estimation is based result in a projection of 25.6 p.p.m. for carbon monoxide in 1977.

Mr. Sullivan utilized a superficial approach to estimate the pollution in Georgetown. This approach involved a comparison with the CAMP station readings in another part of Washington, D. C. The data relied upon and the method of comparison produce a result that is insufficient for the purpose of proving the level of pollutants in Georgetown in 1977.

The construction of Georgetown-Inland North and Maloney will produce increases in the amount of emissions of carbon monoxide and hydrocarbons in the Georgetown area. The Inland North development will at most produce only increases of between 3 and 4 per cent in the emission of carbon monoxide and 1.8 per cent in the emission of hydrocarbons in the area of Defendants' buildings in 1977. Transcript, pp. 787–92. The estimates are properly applicable to the Dodge Center since the two developments are similar in size.

Finally, there are many factors which make the figures estimated at trial very speculative. The Court is especially concerned that changes in traffic patterns, gasoline shortages, changes in the price of gasoline, federal emission limitations on automobiles, federal and local limitations on further construction of parking facilities in the District, the impact of public transportation on traffic running *through* the Georgetown area, and other pollutant-limiting factors which are either implemented or proposed in the District of Columbia Implementation Plan, may substantially reduce the level of pollution in the Georgetown area. These uncertainties and Plaintiffs' failure to present compelling testimony which must be based on these contingencies and would prove the extent of pollution which will occur in the vicinity of Defendants' buildings, result in this Court's conclusion.

## V. CONCLUSION

This Court is firmly against air pollution in the Georgetown area or anywhere else in the Washington Metropolitan Area and wishes to take this opportunity to applaud the Plaintiffs for bringing this action. Their failure to succeed is only because of the inherent difficulties of proof in the premises and the law as herein discussed. Accordingly, this Court finds that the buildings of the Georgetown Inland North Corporation and the Maloney Concrete Company are not regulated by the specific emission standards and limitations of the Clean Air Act and that their completion

will not endanger attainment of the Act's national ambient air quality standards in 1977. Therefore, Defendants may proceed in accordance with the Court's Judgment and Order of even date herewith.

## JUDGMENT AND ORDER

This action came on for trial before the Court sitting without a jury, and the issues having been duly tried and a decision having been duly rendered in accordance with an Opinion filed of even date, it is this 8th day of August, 1974,

Ordered, that all parties' motions for leave to file posttrial papers are granted; and it is

Further ordered and adjudged, that no injunction be issued and that the action be dismissed on the merits; and it is

Further ordered, that no party shall recover any costs except that the Georgetown-Inland Corporations shall pay Plaintiffs' experts, Mr. Morris and Mr. Sullivan, $100 and $550 respectively, under the provisions of Federal Rule of Civil Procedure 26(b)(4)(C).

## ON MOTION TO AWARD ATTORNEYS' FEES AND COSTS

Sept. 30, 1974

### I. INTRODUCTION

This matter is now before the Court on Plaintiffs' Motion to Amend Judgment and To Award Partial Attorneys' Fees and Other Costs. The issue presented is whether Plaintiffs, who were unsuccessful in a suit brought under the Clean Air Act, 42 U.S.C. §§ 1857, et seq., should be awarded costs and attorneys' fees. The Court concludes that this is an exceptional case in which Plaintiffs should be awarded costs and attorneys' fees under the Act, and that the partial request herein is fair and reasonable.

### II. PRIOR LITIGATION IN THIS CASE

The history of this suit is chronicled in this Court's Opinion denying Plaintiffs' Motion for a Preliminary Injunction at 370 F.Supp. 1101 (D.D.C.1974), and in an Opinion accompanying final judgment filed in Civil Action 1944–73, August 8, 1974 [published above]. Two citizens groups, Citizens Association of Georgetown and The Committee of 100 on the Federal City, brought suit against District of Columbia officials and two private corporations to prevent the construction of two buildings in the Georgetown waterfront area of the Nation's Capital. The Court specifically held that its jurisdiction was well-founded under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 1857h–2. [Supra p. 138.] The Court and parties narrowed the issue for trial to the question of whether the planned construction would cause the District of Columbia to be unable to meet the national ambient air quality standards by May 31, 1977. After trial the Court concluded that there had been no violation of an "emission standard or limitation" as defined by the Act, and that Plaintiffs had not proved as a matter of fact that the 1977 air quality standards would be violated. [Supra p. 139.]

### III. DISCUSSION

A. *Congress Has Empowered the District Court to Award Costs and Attorneys' Fees to Either the Successful or Unsuccessful Party Under the Citizen Suit Provision of the Clean Air Act.*

42 U.S.C. § 1857h–2(d) provides that: "[t]he court, in issuing any final order in any action brought pursuant to subsection (a) of [42 U.S.C. 1857h–2], may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate . . . ."

There is nothing in the language of that section which suggests that Congress meant to impose upon the District Court the traditional American rules that costs are awarded only to the successful litigant and that attorneys' fees are awarded to the successful party only in certain special circumstances. *See* Hall v. Cole,

412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). The plain meaning of 42 U.S.C. § 1857h–2(d) is that success or failure on the merits has nothing to do with the trial court's *power* to award costs and attorneys' fees in citizen suits under the Clean Air Act.

The legislative history of the citizen suit provision supports this view. The Senate Committee added subsection (d) to the bill for the purpose of encouraging citizen suits. The Committee report states that:

"[t]he court may award costs of litigation to either party whenever the court determines such award is in the public interest without regard to the outcome of the litigation."

S.Rep. No. 1196, 91st Cong., 2d. Sess. 65 (1970).

B. *The District Court May Properly Award a Reasonable Request for Costs and Attorneys' Fees to an Unsuccessful Plaintiff if the Suit is Legitimate and is a Benefit to the Public Interest as Defined by the Clean Air Act.*

In determining whether the award of costs and attorneys' fees is "appropriate", we look first to the Congressional purpose in enacting 42 U.S.C. § 1857h–2 (d) ; then, in pursuit of that goal, we are also guided by the traditional American rules with respect to the award of costs and attorneys' fees. These sources serve as guidelines to the Court in absence of express Congressional direction in the statute.

■ The Court concludes that an award is appropriate if the suit has benefited the public interest as declared in the Clean Air Act. The Congressional purpose in providing for the award of costs and attorneys' fees in "appropriate" cases is to encourage citizen suits in order to accelerate enforcement of the Act. S.Rep. No. 1196, 91st Cong., 2d Sess. 3 (1970). As quoted in Part III–A herein, the Senate report also indicates that the District Court may make the award when it determines that the public interest would be served.

■ In seeking equity, the Court further concludes that only a reasonable request by an unsuccessful plaintiff may be entertained. The traditional rules are that the prevailing party is awarded costs and that each party bears its own attorneys' fees. Any variation from these principles is an exercise of the general equity jurisdiction of the federal courts. *See* Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). One such variation is that the advancement of an important legislative policy may justify the award of costs and fees even where the plaintiff does not obtain the ultimate relief he seeks. Wilderness Society v. Morton, 495 F.2d 1026, 1034 (D.C.Cir. 1974). In such cases, a standard of reasonableness must be imposed by the court. Against this standard the court should evaluate not only the amount of the request, but also the legitimacy of the claims presented by the suit.

C. *In the Suit at Bar, Plaintiffs Make a Reasonable Request for Costs and Attorneys' Fees, and Their Suit was Both Legitimate and Beneficial to the Public Interest.*

■ Plaintiffs make a modest request for $12,898.98 against only the District of Columbia officials named as defendants. In their motion for costs and fees, Plaintiffs detail a bill of costs amounting to $38,696.96 for this litigation, excluding certain expert fees already awarded to Plaintiffs in the final judgment. They make no claim for costs against the two private Defendants whom the Court found not to be in violation of any law. Accordingly, Plaintiffs have asserted a pro rata claim against the District of Columbia for only one-third of the total costs and fees. The District of Columbia defendants do not contest the reasonableness of the amount.

The Court has carefully considered the relevant factors which the United States Court of Appeals for the District of Columbia suggests to the District Court with respect to its determination of a reasonable attorneys' fee. *See*

Evans v. Sheraton Park Hotel, 503 F.2d 177 (D.C.Cir. 1974). We first note that this case involved legal issues raised by a relatively new statute, and that Plaintiffs' claims presented a case of first impression in this Circuit. Secondly, the issues framed for trial placed a heavy burden of proof on Plaintiffs; therefore, extensive preparation was required. In view of these factors, both the number of hours and the distribution of work among the various attorneys, as detailed in the Plaintiffs' Bill of Costs, are reasonable. Moreover, the calculation of total attorneys' fees is based upon an hourly rate far below the commercial rate in this city and apparently below that rate used by the District Court in an earlier Clean Air Act suit, Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C.), aff'd per curiam, 4 ERC 1815 (D.C.Cir. 1972), aff'd by an equally divided Court, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973).

There is no question that this suit was legitimate. Plaintiffs asserted non-frivolous claims against two private corporations whose buildings will affect the total Georgetown environment. This fact is clearly supported by the record in this case, even though the Court found that Plaintiffs had failed to meet their burden in proving the narrow issue of whether the Defendants would cause violations of the national ambient air quality standards in 1977.

More importantly, Plaintiffs brought their suit in the face of a clean air regulatory vacuum in the District. *See* Citizens Ass'n of Georgetown v. Washington, 370 F.Supp. 1101 (D.D.C.1974). This factor not only made Plaintiffs' burden of proof at trial weighty, but also heightened, in this Court's opinion, this suit's ultimate benefit to the public interest in the District.

In order to understand the public benefit conferred by this suit, it is necessary to understand the basic design of the Clean Air Act. The structure of the Act evidences the Congressional intent *to rely on state and local governments for implementation of control programs* necessary to abate air pollution. 42 U.S. C. § 1857c–5. Where this reliance is frustrated by inaction, as is the case with the District government, the locality is in imminent danger of one, and perhaps both, of two unpleasant eventualities: 1) failure to attain air quality standards requisite for good health, or 2) assumption by the federal government of the task of effecting local air pollution control programs. *See* 42 U.S. C. §§ 1857c–4(b), 1857c–5(c). In the latter case, the air quality control program may not be responsive to particular, local needs.

In light of this Congressional reliance on local governments, the benefits to the public interest conferred by this suit are twofold. The first benefit is that this case presents to the public a record of inaction and action delayed on the part of the District of Columbia government in implementing the Clean Air Act. The second benefit is that this trial is a vivid illustration of the burdens imposed upon a private party who seeks to attain the goals mandated by the Congress in the Act, as evidenced by EPA's national ambient air quality standards, in the face of incomplete implementation of the Act by the District government.

Both of these benefits relate to the overriding purpose of the Clean Air Act: "to protect and enhance the quality of the Nation's air resources . . . ." 42 U.S.C. § 1857(b)(1). The public should know that air pollution continues in the District because the District government has been and continues to be slow in acting to fill the regulatory vacuum. Hopefully, the suit at bar will educate the public and the responsible public officials on this matter. The District points its finger at the Environmental Protection Agency and says that the District is now under no legal direction from thát agency to act. But the simple facts are that Congress has directed the District to meet the national air quality standards no later than May 31, 1977, and that this is a *continuing obligation to act.* The District of Columbia should take it upon

itself to deal with the substantial problems of air pollution in this city *now*!

## IV. CONCLUSION

The Court concludes that the District of Columbia must pay one-third of Plaintiffs' costs and attorneys' fees herein. The Citizens Association of Georgetown and The Committee of 100 on the Federal City brought forward legitimate complaints concerning air pollution in the Georgetown area. Although Plaintiffs lost, the public was served.