SIERRA CLUB, Petitioner,

v.

Anne M. GORSUCH, Administrator of the Environmental Protection Agency, Respondent,

National Coal Association Alabama Power Association, et al., Intervenors.

Nos. 79–1565, 79–1719, 79–1867, 79–1874, 80–1187, 80–1201, 80–1213 and 80–1338.

United States Court of Appeals, District of Columbia Circuit.

Feb. 5, 1982.

See also D.C.Cir., 657 F.2d 298.

Before ROBB, WALD and GINSBURG, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

The Sierra Club and the Environmental Defense Fund ("EDF"), petitioners in *Sierra Club v. Costle*, 657 F.2d 298 (D.C.Cir. 1981) (hereinafter *Sierra Club*), seek an award of attorneys' fees for their participation in an unsuccessful appeal of certain Environmental Protection Agency ("EPA") regulations, 44 Fed.Reg. 33580 (June 11, 1979), promulgated pursuant to the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* (1979 Supp. III). We find that under section 307(f) of the Clean Air Act, 42 U.S.C. § 7607(f), this is an "appropriate" case for the court to award attorneys' fees.

1. *See* Affidavit of David J. Lennett (September 22, 1981).

2. *See* Response For The United States To The Sierra Club's Amended Request For Attorneys' Fees (government support for this approach);

Prior to August, 1981 (when EPA apparently adopted a policy of blanket opposition to all petitions for attorneys' fees by non-prevailing parties[1]), Sierra Club and EDF were actively engaged in negotiations with EPA over the amount of attorneys' fees. Therefore, we hold here only that attorneys' fees may be awarded to non-prevailing parties under section 307(f) and that such an award to Sierra Club and EDF in this case is appropriate, and we suggest that the parties resume their negotiations over the amount. If settlement proves impossible, the parties may return here for resolution of this matter.[2]

I. AUTHORITY UNDER SECTION 307(f) TO GRANT ATTORNEYS' FEES TO NON–PREVAILING PARTIES

■ Section 307(f) of the Clean Air Act provides that

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) *whenever it determines that such an award is appropriate.*

42 U.S.C. § 7607(f) (emphasis added). An award of attorneys' fees under the Clean Air Act is not limited to "substantially prevailing" parties. *Compare* 42 U.S.C. § 7607(f) *with* 5 U.S.C. § 552(a)(4)(E) (awards in FOIA cases available only to a complainant who has substantially prevailed). On its face, the statutory provision clearly permits the court to award attorneys' fees to prevailing, substantially prevailing, or non-prevailing parties in "appropriate" cases.

The legislative history of section 307(f) confirms this reading and offers guidance in identifying "appropriate" cases. The House Report, H.R.Rep.No.294, 95th Cong., 1st Sess. 337 (1977), *reprinted in* 1977 U.S. Code Cong. & Adm.News 1077, 1416, states:

*cf. United States v. American Telephone and Telegraph Co.*, 551 F.2d 384, 394 (D.C.Cir.1976) (where this court suggested that the parties resume negotiation because of the recognized difficulty of appellate court resolution).

In the case of the section 307 judicial review litigation, the purposes of the authority to award fees are not only to discourage frivolous litigation, but also to encourage litigation which will assure proper implementation and administration of the act or otherwise serve the public interest. The committee did not intend that the court's discretion to award fees under this provision should be restricted to cases in which the party seeking fees was the "prevailing party." In fact, such an amendment was expressly rejected by the committee, largely on the grounds set forth in *NRDC v. EPA*, 484 F.2d 1331, 1388 (1st Cir. 1973).[3]

The passage from Judge Campbell's opinion in *National Resources Defense Council v. Environmental Protection Agency*, 484 F.2d 1331, 1338 (1st Cir. 1973) (hereinafter

---

3. Although adding little to our understanding of legislative intent, the Senate Report, S.Rep.No. 127, 95th Cong., 1st Sess. 99 (1977), also confirms our reading:

> Courts may award reasonable attorneys fees to any party against whom EPA acts unreasonably in initiating an enforcement action. Attorneys fees and other costs may also be awarded in judicial review proceedings brought under section 307 of the Clean Air Act whenever the court determines that such an award is appropriate.

The passage explicitly sanctions awards when EPA (1) acts unreasonably in initiating an enforcement action, and (2) when the court otherwise determines that an award is appropriate.

The government has suggested that the legislative intent of section 307(f) cannot be gleaned by working with the 1977 legislative records only. It argues that section 307(f) was meant to parallel section 304(d) of the Clean Air Act, and so the legislative history of that provision too must be consulted. The purpose of section 304(d), the government notes, was to punish "frivolous or harassing litigation, and [to reward] citizens suits which result in pollution abatement, but fail to reach a favorable verdict." Reply Brief For The United States On The Issue Of Attorneys' Fees For Losing Parties Under 42 U.S.C. 7607(f) at 8. In support, the government cites S.Rep. No. 1196, 91st Cong., 2d Sess. 38 (1970), which states:

> Concern was expressed that some lawyers would use section 304 to bring frivolous and harassing actions. The Committee has added a key element in providing that the courts may award costs of litigation, including reasonable attorney and expert witness fees, whenever the court determines that such action is in the public interest. The court could thus award costs of litigation to defendants where the litigation was obviously frivolous or harassing. This should have the effect of discouraging abuse of this provision, while at the same time encouraging the quality of the actions that will be brought.
>
> The Courts should recognize that in bringing legitimate actions under this section citizens would be performing a public service and in such instances the courts should award costs of litigation to such party. This should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions.

While the only example of a non-prevailing party awarded attorneys' fees expressly cited in the Report is one where the case was mooted by abatement, we do not read the Report as ruling out all other instances where attorneys' fees would be appropriate. And, in any case, we cannot disregard the clear legislative history *specific* to section 307, noted in the text. *See* pp. 35–36 *infra*. That history shows that Congress in 1977 specifically adopted the far broader policy of rewarding substantial contributions to the statutory goals of the Act. In 1977 Congress made a clear choice between two different attorneys' fees provisions. *Compare* S. 252 ("In any judicial proceeding under this Act in which the United States ... is a party ... any party other than the United States *which prevails* in such action shall recover ... reasonable costs ... including reasonable attorneys' fees.... In any case in which such party *prevails in part*, the court shall have discretion to award such reasonable costs." (Emphasis added.)) *with* S. 253 ("In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate."). *Reprinted in* 5 A Legislative History of the Clean Air Act Amendments of 1977, 3644, 3817 (1978) (hereinafter Legislative History). During Congressional hearings, areas of controversy on the issue of attorneys' fees included questions about whether there was any need to modify existing judicial practice and whether awards ought to be based on need rather than on the judicial disposition of the suit. *Id.* at 3893.

This legislative history makes it difficult to escape the conclusion that the statutory goals of the Clean Air Act can be furthered by parties who make a substantial contribution to the interpretation and development of the Act, *see* pp. 38–40 *infra*, as well as by substantially prevailing parties and parties who win a favorable result other than by receiving a favorable verdict. *See* pp. 38–40 *infra*.

*NRDC*), endorsed in the House Report, reads:

> The purpose of an award of costs and fees is not mainly punitive. It is to allocate the costs of litigation equitably, to encourage the achievement of statutory goals. When the government is attempting to carry out a program of such vast and uncharted dimensions, there are roles for both the official agency and a private watchdog. The legislation is itself complex and novel. Given the implementation dates, its early interpretation is desirable.

For Judge Campbell, and apparently for Congress, it was not enough merely to consider "who won." The benefits conferred by the litigation were an equally important consideration.[4]

The government here seeks to distinguish *Sierra Club* from *NRDC,* and thereby to pull this case beyond the purview of the plain language and the intent of the statutory provision, by arguing that the party awarded attorneys' fees in *NRDC* prevailed on *some,* although not on all, issues. *See* Brief For The United States On The Issue of Attorneys' Fees For Losing Parties Under 42 U.S.C. 7607(f) at 11. The passage from *NRDC* reprinted above cannot, however, be read so narrowly. It indicates that the relevant inquiry is whether the litigation—successful or not—furthered the goals of the Act. It was this general policy which

Congress sought to codify in the 1977 Amendments of the Clean Air Act.[5]

Our reading of the legislative history is supported by recent decisions of this court and the district court for the District of Columbia. In *Metropolitan Washington Coalition for Clean Air v. The District of Columbia,* 639 F.2d 802 (D.C.Cir.1981) (hereinafter *Washington Coalition*), this court reversed a decision of the district court, which, although acknowledging that unsuccessful parties may be awarded attorneys' fees under the Clean Air Act, found no public benefit from the lawsuit because the challenged operation of a municipal incinerator was ultimately determined not to endanger public health. The district court also found that the suit had "questionable legitimacy" because EPA was already considering revisions of the District of Columbia implementation plan and therefore the non-prevailing party's efforts "did not serve to expedite the Administrator's decision." This court reversed and remanded because:

> the District Court incorrectly focused its attention on the outcome and practical effects of the litigation, to the exclusion of a more relevant consideration: whether the suit was of the type that Congress intended to encourage when it enacted the citizen-suit provision.... Quite obviously, the legislature, when it called for citizen-suits, considered a fee recovery to be consonant with the public interest

---

4. *NRDC* at 1338. *See also Delaware Citizens For Clean Air Inc. v. Stauffer Chemical Company,* 62 F.R.D. 353, 355 (D.Del.1974):

> [I]t is fair to conclude from the language chosen by Congress that ultimate success in a citizen's suit was not intended to be a prerequisite to an award. At the same time, however, in light of the absence of any more specific declaration of congressional intent, I believe that "appropriate" should be read in the context of the pre-existing notions about the circumstances under which one party may fairly be required to bear his adversary's costs of litigation. In this context it seems to this Court that success or failure must be given substantial weight and that an award , of counsel fees to a losing party should be reserved for those cases in which either the litigation, though ultimately unsuccessful, serves the objectives of the Act in some substantial way or in which other exceptional

circumstances tip the balance of the equities decidedly in the losing party's favor. The exercise of the equitable judgment thus called for must be made in light of all the actions of both parties during the course of litigation as well as during the relevant preceding period.

In considering the "appropriateness" of an award, the court also inquired into plaintiff's motives in bringing the suit and whether the suit was substantial or frivolous. It is thus clear that when Congress enacted the "appropriateness" standard in 1977, it was not surveying an empty field.

5. Further, it should be noted that in *Sierra Club* the agency's response to several challenges asserted by the utilities was effectively supplemented by the efforts of the environmental groups. *See* pp. 40–42 *infra.*

whenever the underlying suit was a prudent and desirable effort to achieve an unfulfilled objective of the Act. The attorneys' fee feature was offered as an inducement to citizen-suits, which Congress deemed necessary; and if the hope Congress had for such suits is to become a reality, decisions of fee allowance cannot make wholesale substitutions of hindsight for the legitimate expectations of citizen plaintiffs.

*Id.* at 804. It is true that in *Washington Coalition* we noted that at the time the suit began there may have been "a well founded expectation that the suit would bring about a more timely compliance with the [implementation] plan, and in that fashion an observance of the [Clean Air] Act." *Id.* at 805. The government therefore suggests that we read *Washington Coalition* to permit awards of attorneys' fees to "non-prevailing parties" only in those situations where, except for intervening events, the litigation would have been successful. Although the government's reading is snugly fit to the facts of *Washington Coalition*, that reading is not properly tailored to the case's rationale. We find the rationale of *Washington Coalition* to be broad enough to cover a case like *Sierra Club* where the non-prevailing parties had a "well founded expectation" of success when their suit was brought—the issues were not frivolous but substantial—and where the appeal furthered the goals of the Act by facilitating

the prompt resolution of the important and complex issues confronting this court involving the Act's interpretation. Moreover, by assisting judicial interpretation of the Clean Air Act, Sierra Club and EDF aided agency implementation and Congressional reevaluation[6] of the Act.

Our decision in *Washington Coalition* took note of Judge Richey's opinion in *Citizens Association of Georgetown v. Washington*, 383 F.Supp. 136 (D.D.C.1974), *rev'd on other grounds*, 535 F.2d 1318 (D.C.Cir. 1976) (hereinafter *Citizens Ass'n*). The issue presented there was "whether Plaintiffs, who were unsuccessful in a suit brought under the Clean Air Act, 42 U.S.C. §§ 1857 *et seq.*, should be awarded costs and attorneys' fees." *Id.* at 143. After trial, the district court concluded that the plaintiffs had not successfully proved a violation of the Act. Nevertheless, understanding Congress to have intended courts to award attorneys' fees in appropriate cases to unsuccessful as well as successful parties, the district court granted plaintiffs' request because the litigation had furthered the Act's purpose of encouraging citizen-suits to accelerate enforcement of the Clean Air Act. In support of its holding the court noted that the case was one of first impression in the circuit, extensive preparation was required, non-frivolous claims were raised, and the suit was brought in the face of a clean air regulatory vacuum in the District of Columbia.[7]

**6.** *See* 42 U.S.C. § 7626. Congress is presently considering revisions. *See, e.g.*, H.R. 1431, 97th Cong., 1st Sess. (1981); *see generally*, L. Lave & G. Omenn, Clearing the Air: Reforming the Clean Air Act (1981); E. Haskell, The Politics of Clean Air: EPA Standards for Coal-Burning Power Plants (1982); Pedersen, *Why The Clean Air Act Works Badly*, 129 U.Pa.L. Rev. 1059 (1981). On the status of the revisions, *see* N.Y. Times, Jan. 4, 1982 at B–8.

**7.** *Id.* at 145. More recently, District Judge Robinson granted attorneys' fees to unsuccessful plaintiffs who had brought suit under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, and the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331 *et seq. North Slope Borough v. Andrus*, 515 F.Supp. 961 (D.D.C.1981). (The case is presently before

this court on appeal.) Both ESA, 16 U.S.C. § 1540(g)(4), and OCSLA, 43 U.S.C. § 1349(a)(5), contain attorneys' fees provisions virtually identical to the one contained in the Clean Air Act. 16 U.S.C. § 1540(g)(4) provides:

> The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

43 U.S.C. § 1349(a)(5), provides, in relevant part:

> A court, in issuing any final order in any action brought pursuant to subsection (a)(1) or subsection (c) of this section, may award costs of litigation, including reasonable attorney and expert witness fees, to any party,

It is clear from the foregoing review that whether Sierra Club and EDF are entitled to attorneys' fees turns not on whether they have prevailed in whole or in part, but on whether they have served the goals of the Clean Air Act. The government's current position, that non-prevailing parties are not entitled to attorneys' fees, conflicts with the language and history of section 307 and judicial precedent. Under the government's position, there would have been no need to abandon the "substantially prevailing" standard commonly used to guide judicial awards of attorneys' fees. *See* pp. 34–35 *supra*; n.8 *infra*. Clearly Congress meant something more by the provision in the Clean Air Act: it intended to encourage the participation of "public interest" groups in resolving complex technical questions and important and difficult questions of statutory interpretation, and in monitoring the prompt implementation of the Act.

■ We hasten to alleviate the government's concern that because implementation of the Clean Air Act is so complex, no challenge will appear frivolous and so all non-prevailing parties will automatically be awarded attorneys' fees. We believe that courts confronted with complex cases will be able to distinguish appropriate cases.[8]

whenever such court determines such award is appropriate.

The district court had found violations of both ESA and NEPA, but not OCSLA, and had determined that an award of attorneys' fees was appropriate. This court reversed, finding no statutory violations. *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C.Cir.1981). The attorneys' fees award was neither challenged in nor disturbed by this court. Thereafter, the parties entered into negotiations over the amount of the award. On January 21, 1981, a Stipulation of Settlement was filed, but before court approval, it was withdrawn. On February 3, 1981, the district court, after listening to essentially the same arguments presented here, reaffirmed its ruling that plaintiffs were entitled to attorneys' fees. *North Slope Borough v. Andrus*, 507 F.Supp. 106 (D.D.C.1981). Judge Robinson observed:

The "appropriateness" of an attorneys' fees award is determined by analyzing whether "the underlying suit was a prudent and desirable effort to achieve an unfulfilled objective of the Act." The appropriateness of a fee award may thus be viewed on a continuum—some suits will reflect more "prudent and desirable effort[s]" than others.... Denial of an award of attorneys' fees in this action would throw the issue of entitlement under the applicable statutes completely into disarray. In fact, denial of a fee award could only be supported by the application of the "substantially prevailing party" standard. This would require amending the ESA and the OCSLA, a task beyond the power of the Court. The Court once again affirms Plaintiffs' entitlement to attorneys' fees.

*North Slope Borough v. Andrus*, 515 F.Supp. at 965 (footnotes omitted).

For a similarly worded statutory provision, see the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2618(d):

The decision of the court in an action commenced under subsection (a), or of the Supreme Court of the United States on review of such a decision, may include an award of costs of suit and reasonable fees for attorneys and expert witness if the court determines that such an award is appropriate. *Environmental Defense Fund v. Environmental Protection Agency*, 672 F.2d 42 (D.C.Cir.1982), interprets that provision in a manner consistent with this opinion. *See also*, Deep Seabed Hard Minerals Resources Act, 30 U.S.C. § 1427(c); Clean Water Act, 33 U.S.C. §§ 1365(d), 1415(g)(4), 1515(d); Safe Drinking Water Act, 42 U.S.C. § 300j–8(d); Noise Control Act, 42 U.S.C. § 4911(d); and Energy Policy and Conservation Act, 42 U.S.C. § 6305 (d).

8. Thus even a prevailing or substantially prevailing party who does not substantially contribute to the goals of the Clean Air Act may not be entitled to attorneys' fees. In this respect, the "substantially contributing" standard of the Clean Air Act resembles the "substantially prevailing" standard of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(E), which provides:

The court *may* assess against the United States reasonable attorney fees and other costs *reasonably incurred* in any case under this section in which the complainant has *substantially prevailed.*

(Emphasis added.) FOIA presents two questions for courts determining whether to award fees and costs: (1) is the plaintiff *eligible* for an award, and (2) is the plaintiff *entitled* to an award. *Fund for Constitutional Government v. National Archives and Records Service*, 656 F.2d 856, 870 (D.C.Cir.1981); *Church of Scientology v. Harris*, 653 F.2d 584, 587 (D.C.Cir. 1981) (hereinafter *Harris*); *Cox v. U.S. Dept. of Justice*, 601 F.2d 1, 6 (D.C.Cir.1979) (hereinafter *Cox*). To be eligible for an award under FOIA, the plaintiff must demonstrate (1) that the prosecution of the action could be reasonably regarded as necessary, and (2) that the action had a substantial causative effect on the

In this case, although the parties awarded fees did not *substantially prevail*, they did *substantially contribute* to the goals of the Act: the issues they addressed were important, complex and novel; their assistance in the resolution of the issues was substantial and not duplicative of the efforts of other parties; and the caliber of their written and oral presentations was exemplary. While the occasions upon which non-prevailing parties will meet such criteria may be exceptional, *cf. American Petroleum Institute v. Costle*, No. 79–1104 (D.C.Cir. October 27, 1981) (denial of request for attorneys' fees), *Sierra Club* is such an occasion.

## II. THE APPROPRIATENESS OF AN AWARD OF ATTORNEYS' FEES

A. *The Importance of the Case and the Issues Involved*

*Sierra Club* was a significant case involving an EPA rule governing sulfur dioxide and particulate emissions from fossil-fueled electric utility plants across the nation. We described its impact in our opinion as follows:

> The importance of the challenged standards arises not only from the magnitude of the environment and health interests involved, but also from the critical implications the new pollution controls have for the economy—at the local and nation-

al levels. Further heightening the significance of this controversy is the crucial role coal burning power plants are expected to play in our nation's effort to cope with the problems associated with energy scarcity.[8]

[8] The significance of this case is reflected to some degree in a spate of recent articles. *See* Ackerman & Hassler, *Beyond the New Deal: Coal and the Clean Air Act*, 89 Yale L.J. 1466 (1980). Ackerman and Hassler's article appears in expanded form as a book entitled *Clean Coal/Dirty Air: or How the Clean Air Act Became a Multibillion-Dollar Bail-Out for High Sulfur Coal Producers and What Should Be Done About It* (Yale Univ. Press 1981); Banks, *EPA Bends to Industry Pressure on Coal NSPS—and Breaks*, 9 Ecology L.Q. 67 (1980); Currie, *Direct Federal Regulation of Stationary Sources Under the Clean Air Act*, 128 U.Pa.L.Rev. 1389 (1980); Navarro, *The Politics of Air Pollution*, Public Interest, Spring 1980, 36–44; *see also New Source Performance Standards for Coal-Fired Power Plants*, 8 Ecology L.Q. 784 (1980); *Reconciling Coal Conversion Policy and Significant Deterioration of Air Quality*, 15 Tulsa L.J. 532 (1980).

*See generally* Report of the National Commission on Air Quality, *To Breathe Clean Air* (1981); Del Duca, *The Clean Air Act: A Realistic Assessment of Cost Effectiveness*, 5 Harv. Env.L.Rev. 184 (1981); Smith, *The Fight Over Clean Air Begins*, SCIENCE, March 20, 1981, 1328–30.

*Sierra Club*, 657 F.2d at 313. Our assessment of the case's importance to the national welfare was shared by all parties in the case.[9] The technical complexity of the case

delivery of the documents. *Harris* at 587, 589; *Cox* at 6. Determination of whether a plaintiff is entitled to an award is, however, within the sound discretion of the court. *See Harris* at 590 ("the decision as to whether to award fees and costs to an eligible party rests in the sound discretion of the district court"); *Fenster v. Brown*, 617 F.2d 740, 742 (D.C.Cir.1979) ("Congress, in authorizing the award of attorneys' fees, left to the traditional equitable discretion of the courts the decision whether such fees are appropriate in any given disclosure case."); *Cox* at 7 ("A decision on whether to award attorneys' fees to an eligible party resides in the discretion of the district court . . . ."); *Nationwide Building Maintenance, Inc. v. Sampson*, 559 F.2d 704, 715 (D.C.Cir.1977) ("The touchstone of a court's discretionary decision under section 552(a)(4)(E) must be whether an award of attorney fees is necessary to implement FOIA."); *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1365 (D.C.Cir.1977) ("Although a complainant may have substantially prevailed in an

action, the award of costs and attorney fees does not automatically follow. There are other factors which the court should consider in determining the appropriateness of an award of costs and attorney fees." (Footnotes omitted.)). As in the case of FOIA, by enacting the attorneys' fees provision of the Clean Air Act, Congress has given courts broad discretion. *See Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 262, 95 S.Ct. 1612, 1624, 44 L.Ed.2d 141 (1974) ("the circumstances under which attorneys' fees are to be awarded *and the range of discretion of the courts in making those awards* are matters for Congress to determine" (footnote omitted; emphasis added)).

9. *See, e.g.,* Brief at 5–6 ("[T]his regulation will reduce sulfur dioxide emissions by half, particulate matter emissions by 70 percent . . . . New coal-fired plants will be several times cleaner than existing plants . . . . These benefits will cost billions . . . . In addition, the . . . stan-

necessitated extensive preparation by the parties and the court. In formulating the regulation, EPA had prepared 120 studies, collected 400 items of reference literature, received almost 1,400 comments, written 650 letters and 200 interagency memoranda, held over 50 meetings and substantive telephone conversations with the public, and conducted four days of public hearings. The statement accompanying the regulation took up to 43 pages with triple columns and single-spaced type. Approximately 700 pages of briefs were submitted to this court on the merits of the case. The joint appendix contained 5,620 pages, bound in 12 volumes. The certified index to the record listed over 2,520 submissions. Seven months after oral argument, this court emerged with a 250 page opinion upholding the agency's regulations.

Among the serious questions presented or addressed by Sierra Club and EDF in the appeal were: (1) Whether section 111 of the Clean Air Act as amended in 1977 authorized EPA to promulgate a variable percentage reduction standard rather than a uniform reduction standard, and if so whether variability could be based upon the sulfur content of the coal burned. (*Sierra Club* provided the first major occasion for judicial interpretation of this newly revised provision in the 1977 Amendments to the Clean Air Act, and so demanded not only a microscopic examination of the legislative history but also a detailed review of the practical effects of a variable standard.) (2) Whether a variable standard could be issued in order to encourage new technology, *i.e.*, dry

scrubbing. (This issue required extensive analysis of the record, as well as statutory interpretation of the relationship among several newly amended sections of the Clean Air Act.) (3) Whether EPA's econometric computer model, used to forecast the future impacts of alternative standards, was reliable, and whether the assumptions underlying the model were valid. (Our ruling on this question will inevitably affect agency procedures in a number of substantive contexts.) (4) Whether a 90% reduction of sulfur dioxide was technologically feasible. (A challenge to feasibility was brought by the utilities and defended by the environmental groups as well as EPA.) (5) Whether EPA's adoption of a 1.2 lbs./MBtu emissions ceiling was procedurally defective because of post-comment period contacts. (This was the first comprehensive judicial application of section 307(d) of the Clean Air Act, which legislated a complete set of guidelines for rulemaking under that Act.) None of these issues was remotely frivolous; all deserved to have been aired, and having been aired will contribute both to the agency's future efforts to implement the Clean Air Act and to Congress' ongoing review of the Act.

## B. The Substantial Nature of the Petitioners' Assistance

Although it seems almost inconceivable that a major review of the rule could have been conducted without questioning EPA's authority and evidentiary basis for promulgating a variable percentage reduction

dard ... will prod the development of a technology that is cheaper, more reliable, more energy efficient, less water demanding and more environmentally sound overall."); Brief for Intervenor-Respondent National Coal Association at 4 ("The Standards have a major impact on the type and quality of coal which can be used by new generating plants, as well as on the marketability and competitive position of coal compared to other fuels. In some cases the Standards also have a significant bearing on methods of mining and processing coal."); Appalachian Power Co. Brief at 59 ("If Electric Utilities are correct that compliance with the 90 percent standard entails substantial risks, a large percentage of the coal reserves in Illinois, Indiana, Western Kentucky, Ohio and West

Virginia may be eliminated as a boiler fuel. In addition, fewer new coal fired plants may be built as a result of the disincentives to high sulfur coal use. Finally, if fewer plants are built, additional emissions and oil consumption will result from increase reliance on older coal and oil-fired plants."); Brief of Intervenor Missouri Association of Municipal Utilities at 10 ("The establishment of a variable standard makes the use of dry technology economically feasible at the stage of implementation of the technological control requirement.... [R]elatively small utilities, such as the municipal systems which make up MAMU, will be able to continue use of locally available medium sulfur coal at a much more reasonable cost to their customers.").

standard, an issue that the EPA Administrator had referred to at the start of the rulemaking as the "main" issue in the proceeding, Sierra Club was the only party to raise it. The court was thus totally dependent upon Sierra Club to brief and advocate the opposition to a variable standard. Without Sierra Club, an issue conceded by EPA to be critically important would not have been raised or decided during the first judicial challenge to the statutory provision. The absence of debate on the issue, moreover, could have affected the outcome of other related issues in the case, *e.g.*, the proper level of total emissions (the so-called 1.2 lbs./MBtu standard), since individual standards of section 111 operate interdependently. And the argument pressed most intensely by the utilities, that a 90% reduction in sulfur emissions was technologically infeasible given the state of antipollution technology, would have been far less completely aired without Sierra Club's participation. The various parts of a complex rule like this one do not travel alone, and the court's education on each part of the rule informed its decisions on other parts.

Similarly, the critical role played by EDF in the court's premiere interpretation of the new rulemaking procedures laid down in the 1977 Amendments must be recognized. This first comprehensive judicial interpretation of section 307(d) of the Clean Air Act consumed 60 pages of the court's opinion and involved detailed challenges to several facets of the rulemaking. EDF's contribution involved factual research into meetings and communications between agency officials, White House personnel, members of Congress and industry representatives, as well as a legal analysis of the propriety of such meetings under the new section 307 and existing case law on *ex parte* contacts in rulemaking. Several documents pertaining to these contacts, proffered by EPA for the first time on appeal, were consulted by the court. *See Sierra Club*, 657 F.2d at 389–90 n.450; *cf. Citizens Ass'n*, 383 F.Supp. at 145 (benefits from public exposure). We have little doubt that without EDF's substantial contribution to this aspect of the case, our deliberations would

have been less enriched and more time consuming. We note too that EDF's procedural challenges not only clarified how the new section 307(d) would operate, but apparently provided fuel for discussion about appropriate restrictions on *ex parte* comments in other administrative proceedings. *See* Stockman Memorandum For Heads of Executive Departments and Agencies 2 (June 13, 1981). Again, it was EDF's challenge that instigated the first major judicial inquiry into how section 307's rulemaking procedures would operate—a review that was necessary in order to resolve close questions of interpretation for future rulemaking under the Act.

### C. Conclusion

In conclusion, we find that the express goals of the Clean Air Act—prompt resolution of serious questions of statutory interpretation and citizen participation in monitoring administration of the Act through enforcement suits—require that substantial contributions to significant litigation in furtherance of these goals be compensated. It was absolutely essential in a case of this dimension that this court have expert and articulate spokesmen for environmental as well as industrial interests. The rulemaking process not only involved highly technical and complex data, but controversial considerations of public policy. Given the complexity of the subject matter, without competent representatives of environmental interests, the process of judicial review might have been fatally skewed.

The questions raised by Sierra Club and EDF needed to be resolved; yet no other party had a sufficient economic interest at stake to represent them. Sierra Club and EDF were required to expend great efforts to perform their advocacy tasks well in matters of such technical complexity; their contribution to the court's prompt disposition of all issues raised in the case was substantial. As Congress recognized in enacting the citizen-suit/cost provision of section 307, one cannot expect that contributions as substantial as those made by Sierra Club and EDF would be made by public interest groups without some form of compensation.

## III. INSTRUCTIONS TO THE LITIGANTS

We postpone consideration of the amount of compensation to be awarded in order to allow the parties to resume their abruptly ended negotiations. We commend to the parties the guidelines for attorneys' fees set out in *Environmental Defense Fund v. Environmental Protection Agency*, 672 F.2d 42 (D.C.Cir.1982); *Alabama Power Company v. Gorsuch*, 672 F.2d 33 (D.C.Cir.1982); *Anderson v. United States Department of the Treasury*, 648 F.2d 1 (D.C.Cir.1979); *Copeland v. Marshall*, 641 F.2d 880 (D.C. Cir.1980); and *Evans v. Sheraton Park Hotel*, 503 F.2d 117 (D.C.Cir.1974). Finally, the same statutory language that allows us to make attorneys' fees awards in cases such as *Sierra Club*, limits our power to *judicial* proceedings. *Cf. New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 62, 100 S.Ct. 2024, 2030, 64 L.Ed.2d 723 (1980); *Parker v. Califano*, 561 F.2d 320, 327 (D. C.Cir.1977) (interpretation of statutes not containing limitations to administrative or judicial proceedings). Sierra Club and EDF are, therefore, not entitled to an award of attorneys' fees for their participation in the administrative proceedings preceding their appeal.

The parties are expected to keep this court abreast of the progress of their negotiations by filing a report within three months of the date this opinion issues. If at that time it is clear that settlement is impossible, this court will fix an award for attorneys' fees.[10]

*So Ordered.*

---

**10.** We have taken due notice of Judge Wilkey's dissent in *Alabama Power Co. v. Gorsuch*, 672 F.2d 1, 8 (D.C.Cir.1982). In that dissent, Judge Wilkey expresses disagreement with our interpretation of section 307(f)'s "appropriate" specification and suggests that we have, on the one hand, "conjured up" a number of standards to define that statutory term, and, on the other, "enacted" a single "nonfrivolous" standard. *Id.* at 16. Further, Judge Wilkey appears to accuse us of judicially legislating because of our interpretation of "appropriate." First, we believe our opinion makes clear that we have articulated *one* standard for appropriateness, and that standard allows courts to award attorneys' fees to parties who have "substantially contributed" to the goals of the Clean Air Act. In applying that standard to the *Sierra Club* litigation, we have enumerated several relevant factors, derived from the legislative history and prior cases, which Judge Wilkey mistakenly reads as establishing several different standards. We believe that it is equally clear that the standard we have applied amounts to much more than

a "non-frivolous" standard. *See* pp. 38–40 *supra.* Finally, we do not feel free either to ignore Congress' mandate to determine the appropriateness of an award in each case, or to rewrite its legislation and substitute "prevailing" for "appropriate." Congress expressly used "appropriate" as the standard in section 307(f); it specifically gave to *courts* the authority to interpret that standard on a case-by-case basis (an entirely logical delegation, since courts would be in the best position to assess the contributions of the parties and the importance of each case). That authority is akin to that which courts are already exercising under a variety of statutory provisions. *See* n.8 *supra.* Clearly Congress knows the difference between "prevailing" and "appropriate." *Compare* the statutory provisions cited in n.7 *supra,* with the attorneys' fees provision used in FOIA, n.8 *supra.* Judge Wilkey appears reluctant to permit courts to flesh out section 307(f) as Congress required them to do; we, on the other hand, are reluctant to rewrite the legislation itself.