RUCKELSHAUS, ADMINISTRATOR, ENVIRONMEN-
TAL PROTECTION AGENCY *v.* SIERRA CLUB ET AL.

No. 82–242.   Argued April 25, 1983—Decided July 1, 1983

*Kathryn A. Oberly* argued the cause for petitioner. With her on the briefs were *Solicitor General Lee, Assistant Attorney General Dinkins, Deputy Solicitor General Claiborne, Anne S. Almy,* and *James M. Spears.*

*Harold R. Tyler, Jr.,* argued the cause for respondents. *Bingham Kennedy* and *Barry J. Trilling* filed a brief for respondent Environmental Defense Fund. *Joseph J. Brecher* filed a brief for respondent Sierra Club.

JUSTICE REHNQUIST delivered the opinion of the Court.

In 1979, following a year of study and public comment, the Environmental Protection Agency (EPA) promulgated standards limiting the emission of sulfur dioxide by coal-burning powerplants. Both respondents in this case—the Environmental Defense Fund (EDF) and the Sierra Club—filed petitions for review of the agency's action in the United States Court of Appeals for the District of Columbia Circuit. EDF argued that the standards promulgated by the EPA were tainted by the agency's *ex parte* contacts with representatives of private industry, while the Sierra Club contended that EPA lacked authority under the Clean Air Act to issue the type of standards that it did. In a lengthy opinion, the Court of Appeals rejected all the claims of both EDF and the Sierra Club. *Sierra Club* v. *Costle,* 211 U. S. App. D. C. 336, 657 F. 2d 298 (1981).

Notwithstanding their lack of success on the merits, EDF and the Sierra Club filed a request for attorney's fees incurred in the *Sierra Club* action. They relied on § 307(f) of the Clean Air Act, 91 Stat. 777, 42 U. S. C. § 7607(f) (1976 ed., Supp. V), which permits the award of attorney's fees in certain proceedings "whenever [the court] determines that

such award is appropriate." Respondents argued that, despite their failure to obtain any of the relief they requested, it was "appropriate" for them to receive fees for their contributions to the goals of the Clean Air Act. The Court of Appeals agreed with respondents, ultimately awarding some $45,000 to the Sierra Club and some $46,000 to EDF. *Sierra Club* v. *Gorsuch,* 217 U. S. App. D. C. 180, 672 F. 2d 33 (1982); *Sierra Club* v. *Gorsuch,* 221 U. S. App. D. C. 450, 684 F. 2d 972 (1982). We granted certiorari, 459 U. S. 942 (1982), to consider the important question decided by the Court of Appeals.[1]

## I

The question presented by this case is whether it is "appropriate," within the meaning of § 307(f) of the Clean Air Act, to award attorney's fees to a party that achieved no success on the merits of its claims. We conclude that the language of the section, read in the light of the historic principles of fee-shifting in this and other countries, requires the conclusion that some success on the merits be obtained before a party becomes eligible for a fee award under § 307(f).

## A

Section 307(f) provides only that:

"In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attor-

---

[1] Sixteen federal statutes and § 304(d) of the Clean Air Act, 42 U. S. C. § 7604(d) (1976 ed., Supp. V), contain provisions for awards of attorney's fees identical to § 307(f). See, *e. g.,* Toxic Substances Control Act, 15 U. S. C. § 2618(d); Endangered Species Act, 16 U. S. C. § 1540(g)(4); Surface Mining Control and Reclamation Act, 30 U. S. C. § 1270(d) (1976 ed., Supp. V); Deep Seabed Hard Mineral Resources Act, 30 U. S. C. § 1427(c) (1976 ed., Supp. V); Clean Water Act, 33 U. S. C. § 1365(d); Marine Protection, Research and Sanctuaries Act, 33 U. S. C. § 1415(g)(4); Deepwater Port Act, 33 U. S. C. § 1515(d); Safe Drinking Water Act, 42 U. S. C. § 300j–8(d); Noise Control Act, 42 U. S. C. § 4911(d); Energy Policy and Conservation Act, 42 U. S. C. § 6305(d); Powerplant and Industrial Fuel Use Act, 42 U. S. C. § 8435(d) (1976 ed., Supp. V); Ocean Thermal

ney and expert witness fees) *whenever it determines that such award is appropriate.*"   91 Stat. 777, 42 U. S. C. § 7607(f) (1976 ed., Supp. V) (emphasis added).

It is difficult to draw any meaningful guidance from § 307 (f)'s use of the word "appropriate," which means only "specially suitable: fit, proper."   Webster's Third New International Dictionary 106 (1976).[2]   Obviously, in order to decide when fees should be awarded under § 307(f), a court first must decide *what* the award should be "specially suitable," "fit," or "proper" *for*.   Section 307(f) alone does not begin to answer this question, and application of the provision thus requires reference to other sources, including fee-shifting rules developed in different contexts.   As demonstrated below, inquiry into these sources shows that requiring a defendant, completely successful on all issues, to pay the unsuccessful plaintiff's legal fees would be a radical departure from longstanding fee-shifting principles adhered to in a wide range of contexts.

## B

Our basic point of reference is the "American Rule," see *Alyeska Pipeline Co.* v. *Wilderness Society*, 421 U. S. 240,

---

Energy Conversion Act, 42 U. S. C. § 9124(d) (1976 ed., Supp. V); and Outer Continental Shelf Lands Act, 43 U. S. C. § 1349(a)(5) (1976 ed., Supp. V).   As explained below, the interpretation of "appropriate" in § 307(f) controls construction of the term in these statutes.

[2] Dissenting from an award of fees under § 307(f) by the Court of Appeals for the District of Columbia Circuit, Judge Wilkey noted "the absence of any clue as to the meaning of 'appropriate,'" and wrote that *"there is no comprehensible or principled meaning for 'appropriate.'"   Alabama Power Co.* v. *Gorsuch*, 217 U. S. App. D. C. 148, 171, 179, 672 F. 2d 1, 24, 32 (1982).   The Senate Report to § 307 also illustrates the lack of guidance provided by the plain language of the section.   The Report observed that "[t]he purpose of the amendment to section 307 is to carry out the intent of the committee in 1970 that a court may, *in its discretion,* award costs of litigation to a party bringing a suit under section 307 of the Clean Air Act." S. Rep. No. 95–127, p. 99 (1977) (emphasis added).   See also H. R. Rep. No. 95–294, p. 28 (1977).

247 (1975) (emphasis added), under which even "the *prevailing* litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the *loser.*" It is clear that generations of American judges, lawyers, and legislators, with this rule as the point of departure, would regard it as quite "inappropriate" to award the "loser" an attorney's fee from the "prevailing litigant." Similarly, when Congress has chosen to depart from the American Rule by statute, virtually every one of the more than 150 existing federal fee-shifting provisions predicates fee awards on *some* success by the claimant; while these statutes contain varying standards as to the precise degree of success necessary for an award of fees—such as whether the fee claimant was the "prevailing party,"[3] the "substantially prevailing" party,[4] or "successful"[5]—the consistent rule is that complete failure will not justify shifting fees from the losing party to the winning party. Also instructive is Congress' reaction to a draft of the Equal Access to Justice Act, which permitted shifting fees from losing parties to the Government, if "in the interest of justice," S. 2354, 95th Cong., 2d Sess. (1978). This provision, criticized by the Justice Department as a "radical" departure from traditional principles, was rejected by Congress.[6] Finally, English courts have awarded counsel fees to *successful* litigants for 750 years, see

---

[3] See, *e. g.,* 5 U. S. C. § 504(a)(1) (1982 ed.); Commodity Exchange Act, 7 U. S. C. § 18(f); Voting Rights Act of 1965, 42 U. S. C. § 1973*l*(e); Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988 (1976 ed., Supp. V).

[4] See, *e. g.,* Freedom of Information Act, 5 U. S. C. § 552(a)(4)(E); Privacy Act, 5 U. S. C. §§ 552a(g)(2)(B), 552a(g)(3)(B); Government in the Sunshine Act, 5 U. S. C. § 552b(i).

[5] See, *e. g.,* Real Estate Settlement Procedures Act, 12 U. S. C. § 2607(d)(2); Right to Financial Privacy Act, 12 U. S. C. § 3417(a)(4) (1982 ed.); Jewelers' Liability Act, 15 U. S. C. § 298(c).

[6] Equal Access to Courts: Hearing on S. 2354 before the Senate Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary, 95th Cong., 2d Sess., 31, 50 (1978).

*Alyeska, supra,* at 247, n. 18, but they have never gone so far as to force a vindicated defendant to pay the plaintiff's legal expenses.

While the foregoing treatments of fee-shifting differ in many respects, they reflect one consistent, established rule: a successful party need not pay its unsuccessful adversary's fees. The uniform acceptance of this rule reflects, at least in part, intuitive notions of fairness to litigants. Put simply, ordinary conceptions of just returns reject the idea that a party who wrongly charges someone with violations of the law should be able to force that defendant to pay the costs of the wholly unsuccessful suit against it. Before we will conclude Congress abandoned this established principle that a successful party need not pay its unsuccessful adversary's fees—rooted as it is in intuitive notions of fairness and widely manifested in numerous different contexts—a clear showing that this result was intended is required.[7]

Also relevant in deciding whether to accept the reading of "appropriate" urged by respondents is the fact that § 307(f) affects fee awards against the United States, as well as against private individuals. Except to the extent it has waived its immunity, the Government is immune from claims for attorney's fees, *Alyeska, supra,* at 267–268, and n. 42. Waivers of immunity must be "construed strictly in favor of the sovereign," *McMahon* v. *United States,* 342 U. S. 25, 27 (1951), and not "enlarge[d] . . . beyond what the language requires." *Eastern Transportation Co.* v. *United States,*

---

[7] Indeed, when Congress *has* desired such a change it has said so expressly, as in 15 U. S. C. § 2605(c)(4)(A), permitting fee awards if a party "represents an interest which would substantially contribute to a fair determination of the issues," even if the participant's views are rejected. If Congress intended the truly radical departure from American and English common law and countless federal fee-shifting statutes that the Court of Appeals attributes to it, it no doubt would have used explicit language to this effect—as it did in 15 U. S. C. § 2605.

272 U. S. 675, 686 (1927).   In determining what sorts of fee awards are "appropriate," care must be taken not to "enlarge" § 307(f)'s waiver of immunity beyond what a fair reading of the language of the section requires.

Given all the foregoing, we fail to find in § 307(f) the requisite indication that Congress meant to abandon historic fee-shifting principles and intuitive notions of fairness when it enacted the section.   Instead, we believe that the term "appropriate" modifies but does not completely reject the traditional rule that a fee claimant must "prevail" before it may recover attorney's fees.   This result is the most reasonable interpretation of congressional intent.

## II

Respondents make relatively little effort to dispute much of the foregoing, devoting their principal attention to the legislative history of § 307(f).   Respondents' arguments rest primarily on the following excerpt from the 1977 House Report on § 307(f):[8]

---

[8] Respondents also rely on a single sentence from the 1970 Senate Report:

"The Courts should recognize that in bringing *legitimate actions* under this section citizens would be performing a public service and in such instances the courts should award costs of litigation to such party.   This should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict.   For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions."   S. Rep. No. 91–1196, p. 38 (emphasis added).

The approval of fee awards in "legitimate" actions offers respondents little comfort: "legitimate" means "being exactly as proposed: neither spurious nor false," which does not describe respondents' claims in this case. Respondents contend, however, that Congress intended the term "appropriate" to encompass situations beyond those mentioned in the legislative history, and, therefore, that the term reaches even totally unsuccessful actions.   This is, of course, possible, but not likely.   Congress found it necessary to explicitly state that the term appropriate "extended" to suits that forced defendants to abandon illegal conduct, although without a formal

"The committee bill also contains express authority for the courts to award attorneys *[sic]* fees and expert witness fees in two situations. The judicial review proceedings under section 307 of the act when the court determines such award is appropriate *[sic]*.

"In the case of the section 307 judicial review litigation, the purposes of the authority to award fees are not only to discourage frivolous litigation, but also to encourage litigation which will assure proper implementation and administration of the act or otherwise serve the public interest. *The committee did not intend that the court's discretion to award fees under this provision should be restricted to cases in which the party seeking fees was the 'prevailing party.'* In fact, such an amendment was expressly rejected by the committee, largely on the grounds set forth in *NRDC* v. *EPA,* 484 F. 2d 1331, 1388 *[sic]* (1st Cir. 1973)." H. R. Rep. No. 95–294, p. 337 (1977) (emphasis added).

In determining the meaning of the Senate Report's rejection of the "prevailing party" standard it first is necessary to ascertain what this standard was understood to mean. When § 307(f) was enacted, the "prevailing party" standard had been interpreted in a variety of rather narrow ways. See, *e. g., Taylor* v. *Safeway Stores, Inc.,* 524 F. 2d 263, 273 (CA10 1975); *Pearson* v. *Western Electric Co.,* 542 F. 2d 1150 (CA10 1976); *Best Medium Publishing Co.* v. *National Insider, Inc.,* 385 F. 2d 384, 386 (CA7) (the "'prevailing party'

court order; this was no doubt viewed as a somewhat expansive innovation, since, under then-controlling law, see *infra,* some courts awarded fees only to parties formally prevailing in court. We are unpersuaded by the argument that this same Congress was so sure that "appropriate" also would extend to the far more novel, costly, and intuitively unsatisfying result of awarding fees to unsuccessful parties that it did not bother to mention the fact. If Congress had intended the far-reaching result urged by respondents, it plainly would have said so, as is demonstrated by Congress' careful statement that a *less* sweeping innovation *was* adopted.

is the one who prevails as to the substantial part of the litigation"), aff'g 259 F. Supp. 433 (ND Ill. 1967); *Dobbins* v. *Local 212, Int'l Brotherhood of Electrical Workers, AFL–CIO*, 292 F. Supp. 413, 450 (SD Ohio 1968); *Goodall* v. *Mason*, 419 F. Supp. 980 (ED Va. 1976); *Clanton* v. *Allied Chemical Corp.*, 409 F. Supp. 282 (ED Va. 1976). Some courts—although, to be sure, a minority—denied fees to plaintiffs who lacked a formal court order granting relief, while others required showings not just of some success, but "substantial" success. Indeed, even today, courts require that, to be a "prevailing party," one must succeed on the "central issue," *Coen* v. *Harrison County School Bd.*, 638 F. 2d 24, 26 (CA5 1981), or "essentially succee[d] in obtaining the relief he seeks in his claims on the merits," *Bagby* v. *Beal*, 606 F. 2d 411, 415 (CA3 1979). See also *Hensley* v. *Eckerhart*, 461 U. S. 424, 433, n. 8 (1983).

These various interpretations of the "prevailing party" standard provide a ready, and quite sensible, explanation for the Senate Report's discussion of § 307(f). Section 307(f) was meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing* parties— parties achieving *some success*, even if not major success.[9] Put differently, by enacting § 307(f), Congress intended to eliminate both the restrictive readings of "prevailing party" adopted in some of the cases cited above and the necessity for case-by-case scrutiny by federal courts into whether plaintiffs prevailed "essentially" on "central issues."

This view of the "when appropriate" standard is confirmed by the language of a forerunner of § 307, § 36 of S. 252, 95th Cong., 1st Sess. (1977):

---

[9] Of course, we do not mean to suggest that trivial success on the merits, or purely procedural victories, would justify an award of fees under statutes setting out the "when appropriate" standard. Rather, Congress meant merely to avoid the necessity for lengthy inquiries into the question whether a particular party's success was "substantial" or occurred on a "central issue."

"(d) In any judicial proceeding under this Act in which the United States . . . is a party . . . any party other than the United States which *prevails in such action* shall recover from the United States the reasonable costs for such party's participation in such proceeding, including reasonable attorney's fees. . . . In any case in which *such party prevails in part,* the court shall have discretion to award such reasonable costs."   (Emphasis added.)

This provision was described, in the legislative history, as follows:

"This section amends section 307 of existing law.   In any suit in which the United States is a party, *any prevailing party* . . . shall recover all reasonable costs of its participation in such proceeding.   Where such *party prevails in part,* the court may award reasonable costs."[10]

It is clear from the distinction drawn in these two passages that—as the case law discussed above fairly indicated—Congress understood "prevailing party" and "partially prevailing party" as two quite different things, with the former encompassing only a limited category of parties that achieved success in their lawsuits.   The "prevailing party" category was thought *not* to extend to parties who prevailed only *in part.*

Given this, the House Report's statement that "the court's discretion . . . should [not] be restricted to cases in which the party seeking fees was the *'prevailing party,'*" H. R. Rep. No. 95–294, p. 337 (1977) (emphasis added), provides little, if any, support for the theory that completely unsuccessful plaintiffs may receive fees.   Rather, the sentence, fairly read, means only that fees may be awarded to all parties who *prevail in part* as well as those who *prevail in full:* it rejects the restrictive notions of "prevailing party" adopted

---

[10] Section-by-Section Analysis of S. 252 and S. 253, Prepared by the Staff of the Subcommittee on Environmental Pollution of the Senate Committee on Environment and Public Works, Serial No. 95–2, p. 36 (Comm. Print 1977) (emphasis added).

in *Pearson, supra,* and like cases, as well as difficult questions of what constitutes a "central" issue, or "essential" success. The Report, however, does not give any real support to the view that Congress meant to depart from the long-established rule that complete winners need not pay complete losers for suing them.[11]

This straightforward reading of the House Report finds support in *Natural Resources Defense Council, Inc.* v. *EPA,* 484 F. 2d 1331 (CA1 1973), cited in the Report. There, the court considered whether fees should be denied under § 304(d) "because *some* issues were decided adversely to petitioners." *Id.,* at 1338. This argument was rejected, primarily because "petitioners were successful in several major respects; they should not be penalized for having *also* advanced some points of lesser weight." *Ibid.* (emphasis added). Needless to say, this holding does not mean that even if a party is unsuccessful in *all* respects, it still may

---

[11] Respondents observe that Congress failed to adopt the attorney's fee provision contained in S. 252, discussed above, requiring fee awards to "prevailing parties," and permitting awards to "partially prevailing parties." They argue that Congress' failure to adopt this rule indicates a desire to expand the availability of fee awards to parties not prevailing in any degree. The argument is unpersuasive. Congress almost certainly rejected the provision because it *required* fee awards to "prevailing parties." This rule was specifically criticized by several groups commenting on the proposed legislation. One group wrote: "[W]e strongly oppose Section 36 of S. 252. We see no basis for automatically providing court costs and attorney's fees for parties prevailing in litigation pursuant to the Act. If such parties represent a widespread public interest, they should be able to finance themselves." See 5 Legislative History of the Clean Air Act Amendments of 1977 (Committee Print compiled for the Senate Committee on Environment and Public Works by the Library of Congress), Ser. No. 95-16, pp. 4241, 4255 (1978) (Chamber of Commerce). Indeed, the Natural Resources Defense Council told Congress that the provision *requiring* fee awards to "prevailing parties was "fundamentally unwise" and "wholly unprecedented in American law": it urged that the provision be rejected. *Id.,* at 4092. It is obvious, therefore, that S. 252 was rejected not because it was too restrictive in its awarding of fees, but because it *required,* rather than *permitted* awards of attorney's fees.

recover fees from its opponent. Rather, the court's decision provides precise support for the view, urged above, that adoption of the "when appropriate" standard was intended to permit awards of fees to all partially prevailing parties. After all, this was just what the facts were in *NRDC* v. *EPA*.

The foregoing reading of § 307(f) also finds support in other aspects of the legislative history. For example, § 307(f), as enacted, was regarded as *narrower* than the attorney's fee provision in S. 252, which, as mentioned above, was a forerunner of § 307(f). A section-by-section analysis of S. 252 and § 307(f) stated that the "conference report [setting out the current 'when appropriate' standard] contained a narrower House provision" than S. 252. Section-by-Section Analysis, *supra* n. 10, at 37. Yet, as the quotation, *supra*, at 689, shows, S. 252 permitted fee awards only to prevailing and partially prevailing parties, and *not* to completely losing parties. The statement that the current language of § 307(f) is "narrower" than S. 252 strongly suggests that *losing* parties were not intended to recover fee awards under the section. Moreover, the view that § 307(f) was "narrow" hardly comports with the somewhat radical departure from well-settled legal principles urged by respondents.

In addition, the relation between §§ 304(d) and 307(f) is instructive. Like § 307(f), § 304(d) provides that a court may award fees when "appropriate." Importantly, however, suits may be brought under § 304 against *private* parties alleged to be in violation of the requirements of the Clean Air Act. It is clear, as explained below, that, whatever general standard may apply under § 307(f), a similar standard applies under § 304(d). In *Northcross* v. *Memphis Bd. of Ed.*, 412 U. S. 427 (1973), we held that similar attorney's fee provisions should be interpreted *pari passu*, and read the "prevailing party" standard in 20 U. S. C. § 1617 as identical to that in 42 U. S. C. § 2000a–3(b). In *Hensley*, 461 U. S., at 433, n. 7, we held that "the standards set forth . . . are

generally applicable to all cases in which Congress has authorized an award of fees to a 'prevailing party.'" See also *BankAmerica Corp.* v. *United States*, 462 U. S. 122, 129 (1983). Thus, it is clear, at least as a general principle, that awards of attorney's fees under § 304(d) will be "appropriate" in circumstances similar to those that are "appropriate" under § 307(f).

Given the foregoing, respondents' argument that fee awards are available even to unsuccessful plaintiffs encounters yet further difficulties. Section 304 suits may be brought against private businesses by any private citizen. Such suits frequently involve novel legal theories, theories that the EPA has rejected. After protracted litigation requiring payment of expensive legal fees and associated costs in both money and manpower, the private defendant may well succeed in refuting each charge against it—proving it was in complete compliance with every detail of the Clean Air Act. Yet, under respondents' view of the Act, the defendant's reward could be a second lawyer's bill—this one payable to those who wrongly accused it of violating the law. We simply do not believe that Congress would have intended such a result without clearly saying so.[12]

Finally, as shown in the margin,[13] the central purpose of § 304(d) was to check the "multiplicity of [potentially merit-

---

[12] We do not mean to suggest that private parties should be treated in exactly the same manner as governmental entities. Differing abilities to bear the cost of legal fees and differing notions of responsibility for fulfilling the goals of the Clean Air Act likely would justify exercising special care regarding the award of fees against private parties.

[13] Because, as just shown, §§ 304(d) and 307(f) have similar meanings, the history of § 304 is relevant to a construction of § 307(f). The 1970 Clean Air Amendments contained a new concept—the statutory authorization of "citizens suits," allowing private citizens to sue any person violating the Clean Air Act. This provision attracted vehement opposition in Congress. Senator Hruska, for example, read a memorandum observing that the section *"is unprecedented in American history."* 1 Legislative History of the Clean Air Amendments of 1970 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress) Ser.

less] suits," that Congress feared would follow the authorization of suits under the Clean Air Act, which was seen as an "unprecedented" innovation. One might well imagine the surprise of the legislators who voted for this section as an instrument for deterring meritless suits upon learning that instead it could be employed to fund such suits.

## III

We conclude, therefore, that the language and legislative history of § 307(f) do not support respondents' argument that the section was intended as a radical departure from established principles requiring that a fee claimant attain some success on the merits before it may receive an award of fees. Instead, we are persuaded that if Congress intended such a

---

No. 93–18, p. 277 (1974) (Senate debate on S. 4358, Sept. 21, 1970). The memorandum predicted that § 304 *"will result in a multiplicity of suits which will interfere with the Executive's capability of carrying out its duties"* and warned that § 304's "open invitation to the institution of Citizens Suits" would *"impose an impossible burden on the already burdened judicial system." Id.*, at 278.

The principal response to these concerns was as follows:

"The Senator from Nebraska raised the question of possible harassing suits by citizens. This the committee attempted to discourage by providing that the costs of litigation—including counsel fees—may be awarded by the courts to the defendants in such cases, so that the citizen who brings a harassing suit is subject not only to the loss of his own costs of litigation, but to the burden of bearing the costs of the parties against whom he has brought the suit in the first instance. I doubt very much that individual citizens would lightly engage this possibility." *Id.*, at 280.

This point was repeated in the Senate Report:

"Concern was expressed that some lawyers would use section 304 to bring frivolous and harassing actions. The Committee has added a key element in providing that the courts may award costs of litigation, including reasonable attorney and expert witness fees, whenever the court determines that such action is in the public interest. The court could thus award costs of litigation to defendants where the litigation was obviously frivolous or harassing. This should have the effect of discouraging abuse of this provision, while at the same time encouraging the quality of the actions that will be brought." S. Rep. No. 91–1196, p. 38 (1970).

novel result—which would require federal courts to make sensitive, difficult, and ultimately highly subjective determinations—it would have said so in far plainer language than that employed here. Hence, we hold that, absent some degree of success on the merits by the claimant, it is not "appropriate" for a federal court to award attorney's fees under § 307(f). Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

Even though the Court may regard the practice as "novel, costly, and intuitively unsatisfying," *ante*, at 687, n. 8, it is not at all unusual for a government to pay an unsuccessful adversary's counsel fees; indeed, in the largest category of litigation in which governments engage—criminal litigation—they do so routinely.[1] The question presented in this case is whether Congress has authorized any such award in a challenge to rulemaking by the Environmental Protection Agency. Today the Court holds that, no matter how exceptional the circumstances may be, Congress intended such awards to be made only to prevailing parties. But in § 307(f) Congress deliberately used language that differs from the "prevailing party" standard, and it carefully explained in the legislative history that it intended to give the courts of appeals discretionary authority to award fees and costs to a broader category of parties. If one reads that statute and its legislative history without any strong predisposition in favor of or against the "American Rule" endorsed by the Court in *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 247 (1975), and repeatedly rejected by Congress thereafter, the answer is really quite plain—and it is not the one the Court engrafts on the statute.

---

[1] See 18 U. S. C. § 3006A(d) (1976 ed. and Supp. V).

## I

The Court gives a one-dimensional description of the role played by respondents, Sierra Club and the Environmental Defense Fund, in the *Sierra Club* v. *Costle*, 211 U. S. App. D. C. 336, 657 F. 2d 298 (1981), litigation: they failed to obtain any of the relief they requested. It is necessary to examine this uniquely important and complex litigation more thoroughly in order to illuminate the other considerations that are relevant to an award of attorney's fees under § 307(f) of the Clean Air Act.

The millions of tons of sulfur dioxide emitted by coal-burning powerplants constitute a major source of air pollution in the United States. One method of reducing sulfur dioxide emissions is to install flue gas desulfurization equipment; another is to burn coal with lower sulfur content. In 1977 Congress amended the section of the Clean Air Act governing emission standards for newly built or modified stationary pollution sources, including powerplants. These amendments raised significant questions regarding the pollution control methods that would be required in new powerplants and the levels of sulfur dioxide emissions that would result across the Nation. Section 111, as amended, required EPA to establish standards setting an emission ceiling for each category of new sources and also requiring each such plant to achieve a "percentage reduction" in the emissions that would have resulted from the use of untreated fuels.[2] In 1979, following a lengthy rulemaking proceeding under the Act, the EPA promulgated a controversial new standard for sulfur dioxide emissions by coal-burning powerplants. The standard

---

[2] 42 U. S. C. § 7411(a)(1)(A) (1976 ed., Supp. V). See generally Ackerman & Hassler, Beyond the New Deal: Coal and the Clean Air Act, 89 Yale L. J. 1466, 1494–1514 (1980); Ayres & Doniger, New Source Standard for Power Plants II: Consider the Law, 3 Harv. Envt'l L. Rev. 63 (1979); Currie, Direct Federal Regulation of Stationary Sources Under the Clean Air Act, 128 U. Pa. L. Rev. 1389, 1407–1431 (1980).

established an emissions ceiling of 1.2 pounds/MBtu of sulfur dioxide for all new plants. In addition, it required each new plant to achieve 90% reduction of sulfur dioxide emissions, given the sulfur content of the coal used, except that plants using coal with sufficiently low sulfur content could reduce their emissions by as little as 70% as long as the resulting emissions did not exceed 0.6 pounds/MBtu.[3]

The provisions of EPA's sulfur dioxide standard were interrelated. The Clean Air Act requires EPA to engage in a balancing of factors: "a standard of performance shall reflect the degree of emission limitation and the percentage reduction achievable through application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated." 42 U. S. C. § 7411(a)(1)(C) (1976 ed., Supp. V). Thus, in the rulemaking proceeding, EPA considered various projections of the aggregate costs and nationwide levels of sulfur dioxide emissions that would result from different combinations of requirements. Its evaluation of various proposed standards relied on its understanding of the state of available technology, the likelihood of future technological improvements, and the availability of various types of coal with differing sulfur content.[4]

A number of parties filed petitions for review of the EPA's action in the United States Court of Appeals for the District of Columbia Circuit. As the Court of Appeals wrote: "On

---

[3] See B. Ackerman & W. Hassler, Clean Coal/Dirty Air 79–103 (1981). The new EPA standard also limited emissions of particulate matter by new coal-burning powerplants to 0.03 pounds/MBtu. 44 Fed. Reg. 33580 (1979). MBtu stands for "million British thermal units," a measure of heat energy.

[4] Ackerman & Hassler, *supra* n. 3, at 79–103; 44 Fed. Reg., at 33581–33584; *Sierra Club* v. *Costle*, 211 U. S. App. D. C. 336, 360–390, 394–424, 657 F. 2d 298, 322–352, 356–386 (1981).

this appeal we consider challenges to the revised NSPS [new source performance standards] brought by environmental groups which contend that the standards are too lax and by electric utilities which contend that the standards are too rigorous." *Sierra Club* v. *Costle,* 211 U. S. App. D. C., at 349–350, 657 F. 2d, at 311–312. Eighty-seven utility companies and two utility industry organizations challenged the strictness of the 90% reduction requirement as well as the 0.03 pounds/ MBtu limit on emissions of particulate matter. On the other hand, the Sierra Club and the State of California Air Resources Board opposed the variable percentage reduction standard, contending that the statute required a uniform percentage reduction and that the record did not support EPA's action. The Environmental Defense Fund challenged the 1.2 pounds/MBtu ceiling on procedural grounds, contending that EPA failed to adopt a more stringent standard because of *ex parte* contacts after the close of the comment period. Intervenor-respondents in the Court of Appeals included various electric utilities, which filed briefs defending the variable percentage reduction standard and the 1.2 pounds/MBtu ceiling, and the National Coal Association, which opposed EDF's claim that the 1.2 pounds/MBtu standard was invalid due to procedural impropriety.

These complex, interrelated contentions presented the Court of Appeals with an immense judicial task.

> "In formulating the regulation, EPA had prepared 120 studies, collected 400 items of reference literature, received almost 1,400 comments, written 650 letters and 200 interagency memoranda, held over 50 meetings and substantive telephone conversations with the public, and conducted four days of public hearings. The statement accompanying the regulation took up to 43 pages with triple columns and single-spaced type. Approximately 700 pages of briefs were submitted to this court on the merits of the case. The joint appendix contained 5,620

pages, bound in 12 volumes. The certified index to the record listed over 2,520 submissions." *Sierra Club* v. *Gorsuch*, 217 U. S. App. D. C. 180, 187, 672 F. 2d 33, 40 (1982).[5]

The Court of Appeals rejected the petitions for review filed by the respondents in this case, the Sierra Club and the Environmental Defense Fund, although not entirely for the reasons stated by EPA; it also rejected the contentions of the utilities. The opinion, 256 pages in printed slip opinion form and 132 pages in the Federal Reporter, ended with "a short conclusion: the rule is reasonable." 211 U. S. App. D. C., at 448, 657 F. 2d, at 410.[6]

After further proceedings, the Court of Appeals unanimously decided that it was appropriate to award attorney's fees to both respondents.[7] It first concluded that § 307(f) gave it authority to award fees in an "appropriate" case even to a party that did not prevail on any issue it addressed. The court then explained in some detail the grounds for its conclusion that the respondents had substantially contributed

---

[5] See Wald, Making "Informed" Decisions on the District of Columbia Circuit, 50 Geo. Wash. L. Rev. 135, 145 (1982).

[6] The court's concluding discussion does not support petitioner's suggestion that "the court had no difficulty rejecting Sierra Club's construction of the statute." Brief for Petitioner 33, n. 21. The court wrote:

"We reach our decision after interminable record searching (and considerable soul searching). We have read the record with as hard a look as mortal judges can probably give its thousands of pages. We have adopted a simple and straight-forward standard of review, probed the agency's rationale, studied its references (and those of appellants), endeavored to understand them where they were intelligible (parts were simply impenetrable), and on close questions given the agency the benefit of the doubt out of deference for the terrible complexity of its job." 211 U. S. App. D. C., at 448, 657 F. 2d, at 410.

[7] The actual amount of the award was established in a subsequent *per curiam* opinion, *Sierra Club* v. *Gorsuch*, 221 U. S. App. D. C. 450, 684 F. 2d 972 (1982), from which Judge Robb dissented in part. The Sierra Club was awarded $44,715, plus $644.60 in expenses; the Environmental Defense Fund was awarded $45,874.10.

to the goals of the Act. "While the occasions upon which non-prevailing parties will meet such criteria may be exceptional, . . . *Sierra Club* is such an occasion." 217 U. S. App. D. C., at 186, 672 F. 2d, at 39.[8]

Sierra Club, the court noted, was the only party to brief and advocate opposition to a variable standard, an issue conceded by EPA to be critically important. Had this issue not been debated, moreover, the outcome of other related issues in the case—including the appropriateness of the 1.2 pounds/MBtu standard and the technological feasibility of the 90% reduction requirement—might have been affected. The court expressly stated: "[T]he argument pressed most intensely by the utilities, that a 90% reduction in sulfur emissions was technologically infeasible given the state of antipollution technology, would have been far less completely aired without Sierra Club's participation. The various parts of a complex rule like this one do not travel alone, and the court's education on each part of the rule informed its decisions on other parts." *Id.*, at 188, 672 F. 2d, at 41.[9]

The Court of Appeals explained that, even though respondents were not "prevailing parties," either in whole or in part,

---

[8] The Court of Appeals made clear that it was adopting a stringent standard. Indeed, it noted that even a prevailing or substantially prevailing party might not substantially contribute to the goals of the Clean Air Act, and might therefore not be entitled to attorney's fees. 217 U. S. App. D. C., at 185, n. 8, 672 F. 2d, at 38, n. 8.

[9] See also *id.*, at 183, n. 5, 672 F. 2d, at 36, n. 5; *id.*, at 187, 672 F. 2d, at 40 (the utilities' challenge to feasibility was "defended by the environmental groups as well as EPA"). In its opinion on the merits, the court wrote that the evidence on both sides of the 90% reduction issue was "extraordinarily technical and often confusing." 211 U. S. App. D. C., at 398, 657 F. 2d, at 360.

In similar fashion, the Environmental Defense Fund played a critical role in informing the court's deliberations on a substantial issue—alleged *ex parte* contacts in the rulemaking process. EDF's substantial contribution included factual research, legal analysis, and the disclosure of Government documents without which, according to the court, "our deliberations would have been less enriched and more time consuming." 217 U. S. App. D. C., at 188, 672 F. 2d, at 41.

their participation may have made a difference in the outcome of the litigation.

> "It was absolutely essential in a case of this dimension that this court have expert and articulate spokesmen for environmental as well as industrial interests. The rulemaking process not only involved highly technical and complex data, but controversial considerations of public policy. Given the complexity of the subject matter, without competent representatives of environmental interests, the process of judicial review might have been fatally skewed." *Ibid.*

The then EPA Administrator disputed the amount of the fee award in the Court of Appeals, but petitioner does not contest its reasonableness before this Court. Petitioner also apparently does not assert that, if it is ever appropriate to award fees to a losing party, the Court of Appeals improperly exercised its discretion to make an award in this case.[10] Rather, petitioner asserts as a matter of law that § 307(f) of the Clean Air Act should be construed to forbid *any* award to *any* nonprevailing party. The majority accepts this contention. But the language of § 307(f), the legislative history, and the legislative history of § 304(d) all demonstrate that petitioner's position should be rejected.

## II

The language of § 307(f) is straightforward. It provides:

> "In any judicial proceeding under this section, the court may award costs of litigation (including reasonable at-

---

[10] "[T]he fundamental issue we have tendered—which is one of law rather than fact—is whether Congress intended the courts *ever* to have discretion to award fees to totally unsuccessful parties. Contrary to respondents' suggestions, the size or complexity of the case has no bearing on this question. . . . Thus, the Court need only determine whether, as a matter of law, the discretion conferred by Congress encompasses fee awards to totally unsuccessful litigants." Reply Brief for Petitioner 1–2 (filed Oct. 13, 1982).

torney and expert witness fees) whenever it determines that such award is appropriate." 42 U. S. C. § 7607(f) (1976 ed., Supp. V).

The challenge to the sulfur dioxide emission standard in the Court of Appeals was unquestionably a "judicial proceeding under" § 307. That court explained the reasons why it believed that an award was appropriate in this case. It therefore complied with the plain language of the statute.

As the Court of Appeals correctly observed, the language of § 307(f) differs crucially from the wording of many other federal statutes authorizing the court to award attorney's fees and costs.[11] Most of those statutes expressly require that a party "prevail" or "substantially prevail" in order to obtain fees.[12] The contrast between the text of § 307(f) and

---

[11] In the absence of statute, the general rule in America is that each party must pay the fees of his own counsel. *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 247 (1975). This rule prevails in federal litigation unless Congress has otherwise provided. Congress has enacted a variety of different attorney's fees statutes. In various situations, it has provided that a fee award for the prevailing party is mandatory, see, *e. g.*, 15 U. S. C. § 15 (1976 ed., Supp. V) (Clayton Act); that the court shall have authority to allow fees "in exceptional cases," see, *e. g.*, 35 U. S. C. § 285 (patent cases); or that an award should normally be made to a successful plaintiff "absent exceptional circumstances," see, *e. g.*, 42 U. S. C. § 1988 (1976 ed., Supp. V); *Hensley* v. *Eckerhart*, 461 U. S. 424, 429 (1983). Indeed, in one category of litigation—criminal cases—Congress has expressly mandated compensation for counsel for indigent defendants regardless of the outcome of the litigation. 18 U. S. C. § 3006A(d) (1976 ed. and Supp. V). "Under this scheme of things, it is apparent that the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." *Alyeska Pipeline, supra*, at 262.

[12] For statutes limiting fees to "prevailing parties," see, *e. g.*, 5 U. S. C. § 504(a)(1) (1982 ed.) ("An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency as a party to the proceeding was substantially justified or that special circumstances make an award unjust"); 7 U. S. C. § 18(f) (Commodity

the text of other attorney's fees statutes strongly supports the conclusion that Congress did not intend the outcome of the case to be conclusive in the decision whether to award fees under § 307(f).

Nevertheless the Court today asserts that a statute which does not refer to "prevailing parties" actually *does* refer to "prevailing parties." It does so by invoking the "American Rule" that losing parties do not pay the attorney's fees of their successful opponents, and by asserting that "virtually every one of the more than 150 existing federal fee-shifting provisions predicates fee awards on *some* success by the claimant." *Ante*, at 684. Factually, as the Court's own opinion makes clear, this is something of an overstatement. After all, the Court notes that 16 federal statutes and § 304(d) of the Clean Air Act contain provisions for awards of attorney's fees identical to § 307(f). *Ante*, at 682–683, n. 1. Logi-

---

Exchange Act) ("If the petitioner finally prevails, he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit"); 42 U. S. C. § 1973*l*(e) ("In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs"); 42 U. S. C., § 1988 (1976 ed., Supp. V) ("the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs").

For statutes limiting fees to "substantially prevailing" parties, see, *e. g.*, 5 U. S. C. § 552(a)(4)(E) (Freedom of Information Act) ("The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed"); 5 U. S. C. §§ 552a(g)(2)(B), 552a(g)(3)(B) (Privacy Act); 5 U. S. C. § 552b(i) (Government in the Sunshine Act).

For statutes requiring that a party be successful, see 12 U. S. C. § 2607(d)(2) (Real Estate Settlement Procedures Act) ("In any successful action to enforce the liability under this paragraph, the court may award the court costs of the action together with a reasonable attorney's fee as determined by the court"); 12 U. S. C. § 3417(a)(4) (1982 ed.) (Right to Financial Privacy Act); 15 U. S. C. § 298(c) (Jewelers' Liability Act) (any jewelry trade association may sue "and if successful shall recover the cost of suit, including a reasonable attorney's fee").

cally the assertion is a non sequitur. It begs the question at issue in this case—whether, by using significantly different language in § 307(f), Congress wished to depart from or to adopt the more customary standard.[13]

## III

The legislative history, like the text of the statute, supports the conclusion that Congress intended to allow attorney's fees not only to prevailing parties but also, in appropriate circumstances, to nonprevailing parties. In 1977, when § 307(f) was added to the Clean Air Act, the Senate Committee considered, but did not adopt, a provision that would have required the Court of Appeals to award fees to any "party other than the United States which prevails in such action" and would have given it discretion to award fees to a party "[i]n any case in which such party prevails in part."[14]

---

[13] If one assumes, as apparently the Court does, that the word "appropriate" is ambiguous, *ante*, at 683, then I would think it necessary to examine the legislative history of each statute in which the word has been used in order to ascertain its meaning. The Court, however, relying on the legislative history of one statute, § 307(f)—which actually points in the other direction—concludes that all 16 other statutes limit fee awards to prevailing parties. *Ante*, at 682–683, n. 1.

[14] See 3 Legislative History of the Clean Air Amendments of 1977 (Committee Print compiled for the Senate Committee on Environment and Public Works by the Library of Congress), Ser. No. 95–16, p. 688 (1978) (1977 Leg. Hist.). See 5 *id.*, at 3644 (S. 252, introduced Jan. 14, 1977); 122 Cong. Rec. 23834 (1976) (remarks of Sen. Buckley). Written comments submitted to the Senate Committee on behalf of the Edison Electric Institute observed that the fees provision of S. 252, limited to parties that prevailed at least in part, was "less sweeping" than language in S. 253, which would "permit the court to award costs of litigation whenever it feels such award is appropriate." 5 1977 Leg. Hist., at 4146–4147. Before reporting S. 252 to the Senate floor, the Committee struck out the "prevailing party" language and substituted the "appropriate" test. 3 *id.*, at 573–575, 688.

The Clean Air Act Amendments passed by the Senate the previous year, S. 3219, had similarly required an award of fees for prevailing parties and further provided that, in any case "in which such party prevails in part, the court shall have discretion to award such reasonable costs." S. 3219, § 35, 94th Cong., 2d Sess. (1976), 6 1977 Leg. Hist., at 4689. At conference,

The Senate Report explained that, under the different provision the Committee had chosen to adopt, fees and costs may be awarded "whenever the court determines that such an award is appropriate." [15]   It is clear from the House Report that the language of § 307(f), "whenever [the court] determines that such an award is appropriate," was intended to be broader than a "prevailing party" standard:

> "In the case of the section 307 judicial review litigation, the purposes of the authority to award fees are not only to discourage frivolous litigation, but also to encourage litigation which will assure proper implementation and administration of the act or otherwise serve the public interest. *The committee did not intend that the court's discretion to award fees under this provision should be restricted to cases in which the party seeking fees was the 'prevailing party'.*   In fact, such an amendment was expressly rejected by the committee, largely on the grounds set forth in *NRDC* v. *EPA*, 484 F. 2d 1331, 1388 (1st Cir. 1973)." H. R. Rep. No. 95–294, p. 337 (1977), 4 1977 Leg. Hist., at 2804 (emphasis supplied). [16]

---

however, the House version—providing for an award of fees in "appropriate" cases—was adopted.   H. R. Conf. Rep. No. 94–1742, pp. 115–116 (1976), 5 1977 Leg. Hist., at 4400–4401; *id.*, at 6071 (text of conference bill, H. R. 10498).   The conference bill was not enacted by Congress in 1976, but the 1976 legislative history buttresses the conclusion that Congress consciously chose the "appropriate" standard rather than the "prevailing party" standard when it enacted amendments to the Clean Air Act a year later.

[15] S. Rep. No. 95–127, p. 99 (1977), 3 1977 Leg. Hist., at 1473; see *ibid.* ("a court may, in its discretion, award costs of litigation to a party bringing a suit under section 307 of the Clean Air Act"); *id.*, at 9, 3 1977 Leg. Hist., at 1383 ("Section 307 is amended to give courts the discretion to award attorneys' fees when they deem such action is appropriate").   The Conference Report merely tracks the language of the statute.   See H. R. Conf. Rep. No. 95–564, pp. 176–177 (1977), 3 1977 Leg. Hist., at 556–557.

[16] The Report added: "In adopting this provision concerning fees, the committee intended to meet the requirement for specific authorization im-

The cited portion of the opinion of the First Circuit in *Natural Resources Defense Council, Inc.* v. *EPA*, 484 F. 2d 1331, 1338 (1973),[17] sets forth the test of whether the party seeking fees has contributed to the goals of the environmental statute—a different test from whether it has prevailed. Judge Campbell wrote:

> "The authorizing language of § 304(d) permits an award 'to any party, whenever the court determines such award is appropriate.' This suggests greater latitude even than is found in 28 U. S. C. § 2412, which authorizes awards to 'the prevailing party'. We are at liberty to consider not merely 'who won' but what benefits were

posed by 28 U. S. C. sec. 2412 and by the Supreme Court's ruling in *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240 (1975)." H. R. Rep. No. 95–294, at 337, 4 1977 Leg. Hist., at 2804. The entire passage appeared in identical form in the House Report regarding the Clean Air Act amendments passed by the House in 1976. H. R. Rep. No. 94–1175, p. 277 (1976), 7 1977 Leg. Hist., at 6826.

The majority places considerable weight on the statement made in a Staff Report that language actually adopted in § 307(f) was "narrower" than the rejected formulation. *Ante*, at 691. If the Staff Report was actually referring to § 307(f), its view would be inconsistent with the position of the House Committee, surely a more reliable source of congressional intent. But in fact, I think the majority misinterprets the Staff Report, which stated:

"The conference report [§ 307(f)] contained a narrower House provision. It authorized but did not require, courts to award reasonable attorneys fees to any party against whom EPA acted unreasonably in initiating an enforcement action. The award of attorneys fees was also authorized in judicial review proceedings brought under section 307 of the Clean Air Act." Section-by-Section Analysis of S. 252 and S. 253, Prepared by the Staff of the Subcommittee on Environmental Pollution of the Committee on Environment and Public Works, Ser. No. 95–1, p. 37 (Comm. Print 1977), 5 1977 Leg. Hist., at 3893.

The "narrower House provision" seems to be the provision for awarding fees to the targets of unreasonable EPA enforcement actions. This section was codified as part of § 113(b), 42 U. S. C. § 7413(b) (1976 ed., Supp. V)—not as part of § 307(f). See 5 1977 Leg. Hist., at 4354.

[17] It is apparent that the citation of page 1388 instead of 1338 is a typographical error.

conferred. The purpose of an award of costs and fees is not mainly punitive. It is to allocate the costs of litigation equitably, to encourage the achievement of statutory goals. When the government is attempting to carry out a program of such vast and unchartered dimensions, there are roles for both the official agency and a private watchdog. The legislation is itself novel and complex. Given the implementation dates, its early interpretation is desirable. It is our impression, overall, that petitioners, in their watchdog role, have performed a service." *Ibid.*

In the *NRDC* case the party receiving the fee award had prevailed on some issues. The court noted that even those challenges that were "not sustained, were mainly constructive and reasonable." *Ibid.*[18] Today the majority seizes on this fact in an attempt to explain away the clear intention stated in the Senate Report. But the Committee adopted the reasoning, not the facts, of the opinion in *NRDC* v. *EPA.*

## IV

Unpersuaded by the statutory language and legislative history, the Court relies heavily on two other propositions. First, it notes, the doctrine of sovereign immunity requires that any statute authorizing the payment of fees and costs by the United States must be strictly construed. *Ante,* at 685–686. But this general statement does little to support the Court's position in this case. Congress clearly intended to authorize fees in certain circumstances, see n. 16, *supra,* and left it to the courts to ascertain which cases would be "appro-

---

[18] Earlier in the opinion, Judge Campbell wrote that, as a result of petitioners' citizen suit, "policies of the EPA have been corrected and others, upheld, have been removed from the arena of dispute. . . . [S]ome of the legal principles at issue have national as well as regional import. Petitioners have thus helped to enforce, refine and clarify the law. They can be said to have assisted the EPA in achieving its statutory goals." 484 F. 2d, at 1334.

priate."[19]  Second, the majority finds the relation between § 307(f) and § 304(d), a similarly worded Clean Air Act provision enacted in 1970, to be "instructive." *Ante*, at 691.[20]  I do not share the majority's interpretation of the significance of § 304(d).

As originally proposed in 1970, § 304(d) provided for attorney's fee awards "whenever the court determines such action is in the public interest."[21]  The Senate Report on that provision explained that the Committee intended to give courts the authority to award costs to defendants who had been harassed by frivolous litigation, and also to compensate citizens who performed a public service by bringing actions that successfully caused the defendant to abate an environmental violation "before a verdict is issued."[22]  Subsequently the

---

[19] Thus our discussion in *Indian Towing Co.* v. *United States*, 350 U. S. 61, 69 (1955), is fully apposite here: "Of course, when dealing with a statute subjecting the Government to liability for potentially great sums of money, this Court must not promote profligacy by careless construction.  Neither should it as a self-appointed guardian of the Treasury import immunity back into a statute designed to limit it."  See *Canadian Aviator, Ltd.* v. *United States*, 324 U. S. 215, 222–226 (1945) (refusing to interpret an Act authorizing suits against the United States as narrowly as the Government suggested, because "we think Congressional adoption of broad statutory language authorizing suit was deliberate and is not to be thwarted by an unduly restrictive interpretation").

[20] Section § 304(d), 42 U. S. C. § 7604(d) (1976 ed. and Supp. V), provides for fee awards in citizens' suits brought in federal district court against alleged violators or against the EPA Administrator seeking enforcement of the Clean Air Act:

"The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."

[21] S. 4358, § 304(d), 91st Cong., 2d Sess. (1970), 1 Legislative History of the Clean Air Amendments of 1970 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–18, pp. 705–706 (1974).

[22] "The Committee has added a key element in providing that the courts may award costs of litigation, including reasonable attorney and expert

language was changed from "in the public interest" to "appropriate," without any apparent change in meaning.

It by no means follows, however, that Congress intended, by using the word "appropriate," to assure only that successful parties in these two situations would be eligible for fees.[23] Indeed, such an interpretation is contradicted by the open-ended language used to describe § 304(d) in the section-by-section analysis in the same Senate Report. The Committee specifically stated: "The court may award costs of litigation to either party whenever the court determines such an award is in the public interest without regard to the outcome of the litigation." S. Rep. No. 91–1196, p. 65 (1970). The fact that attorney and expert witness fees were treated alike in § 304(d) corroborates this interpretation of the 1970 Act. A true expert witness can often provide valuable assistance to the finder of fact, even if the expert's ultimate conclusion is rejected or the party who offered the expert's testimony does not prevail.

When the 1977 Act was passed, Congress made clear that the courts had the power to award fees and costs in actions brought in the courts of appeals under § 307 as well as those filed in district courts under § 304.[24] As its citation to the

witness fees, whenever the court determines that such action is in the public interest. The court could thus award costs of litigation to defendants where the litigation was obviously frivolous or harassing. This should have the effect of discouraging abuse of this provision, while at the same time encouraging the quality of the actions that will be brought.

"The Courts should recognize that in bringing legitimate actions under this section citizens would be performing a public service and in such instances the courts should award costs of litigation to such party. This should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions." S. Rep. No. 91–1196, p. 38 (1970).

[23] Cf. *United States* v. *Turkette*, 452 U. S. 576, 591 (1981).

[24] The word "appropriate," however, may well have different meanings in § 304 suits, which serve the primary function of aiding in the abatement of

1973 *NRDC* opinion demonstrates, it also took into account post-1970 judicial developments in attorney's fees law. By 1977, if not before 1970, the case law had made clear that the authority to award fees to "prevailing parties" included the two situations specifically mentioned in the 1970 legislative history.[25] It was therefore not necessary to go beyond the

air pollution by stimulating *enforcement* of standards and regulations under the Clean Air Act, and in § 307 suits, which challenge the *validity* of air pollution standards promulgated by the agency. The reference in the 1970 legislative history to abatement of a violation before judgment in litigation, for example, has no direct applicability to § 307 actions seeking judicial review. In addition, private parties may be defendants in § 304 actions but not in § 307 judicial review proceedings. I do not believe it would be appropriate for a court to require a *private* defendant to pay the attorney's fees of an unsuccessful plaintiff in a § 304 suit, and of course, the possibility would never arise in a § 307 action. Thus, the Court's discussion, *ante*, at 691–692, has the same heroic quality as Don Quixote's defense against the charge of the windmills.

[25] Petitioner concedes that, before and during 1977, "prevailing parties" included plaintiffs who obtained favorable settlements rather than litigated judgments. See Brief for Petitioner 20–21, n. 13 (citing four 1976 civil rights cases, three FOIA cases decided in 1976 and one in 1977). Indeed, even before the 1970 Act was passed, the "prevailing party" standard had not always been construed narrowly to exclude such plaintiffs. See *Parham* v. *Southwestern Bell Tel. Co.*, 433 F. 2d 421, 429–430 (CA8 1970) (plaintiff whose Title VII suit acted as a "catalyst" prompting the defendant company to change its discriminatory employment policies was entitled to attorney's fees as a "prevailing party" even though he received no individual remedy and no injunctive relief was granted to the class); *Corcoran* v. *Columbia Broadcasting System, Inc.*, 121 F. 2d 575, 576 (CA9 1941) (under copyright statute, limiting attorney's fees to a "prevailing party," the court had power to allow fees when the defendant obtained a court order for the clarification of the complaint and the plaintiff then voluntarily dismissed without amending his pleading).

The majority suggests, however, that Congress decided not to adopt the "prevailing party" standard because it was aware of cases denying "prevailing party" status unless the plaintiff had prevailed "as to a substantial part of the litigation" or had succeeded on the "central issue." *Ante*, at 688. But the House Report's citation of *Natural Resources Defense Council, Inc.* v. *EPA*, 484 F. 2d 1331 (CA1 1973), casts doubt on that contention.

"prevailing parties" standard to achieve the result petitioner now seeks to ascribe to Congress in 1977. Moreover, the "appropriate" standard in § 304(d) itself had been construed more broadly to permit awards to nonprevailing parties.[26]

The majority's position is simple but illogical: Congress in 1977 used the term "whenever [the court of appeals] determines that such an award is appropriate" to mean when the plaintiff is a "prevailing party" or "partially prevailing party." *Ante*, at 689. It would have been much simpler for Congress to use the language "prevailing party" and "partially prevailing party" if that is precisely what it meant. Instead, it expressly rejected such language,[27] which it had previously used in countless other statutes, see n. 12, *supra*, and chose to authorize the court to award fees "whenever it determines that such an award is appropriate."

Accordingly, I cannot agree with the Court's interpretation of the statutory language. Congress decided that in exceptional circumstances it might be "appropriate" to award attorney's fees to nonprevailing parties. Of course, as the Court of Appeals recognized, it would be unreasonable to presume, against the background of attorney's fees statutes generally, that Congress intended fees to be awarded to every nonprevailing party who has litigated a nonfrivolous challenge to an EPA regulation. See 217 U. S. App. D. C., at 183, n. 4, 185, 189, n. 10, 672 F. 2d, at 36, n. 4, 38, 42,

---

[26] See, *e. g.*, *Delaware Citizens for Clean Air, Inc.* v. *Stauffer Chemical Co.*, 62 F. R. D. 353, 355 (Del. 1974) (acknowledging the power to award such fees but exercising discretion not to make such an award in that case), aff'd, 510 F. 2d 969 (CA3 1975); *Citizens Assn. of Georgetown* v. *Washington*, 383 F. Supp. 136, 143–146 (DC 1974), rev'd on other grounds, 175 U. S. App. D. C. 356, 535 F. 2d 1318 (1976).

[27] To the extent that Congress wished to respond to the concerns expressed by the Chamber of Commerce and the Natural Resources Defense Council, see *ante*, at 690, n. 11, it could simply have amended S. 252 to give courts discretion to award fees and costs to prevailing and partially prevailing parties.

n. 10.  The degree of success or failure should certainly be weighed in the balance to determine whether it is appropriate to require the Government to bear its adversary's costs of litigation.  In my view it would be an abuse of discretion for the Court of Appeals to award fees to a nonprevailing party unless its contribution to the process of judicial review, or to the implementation of the Act by the agency, had truly been substantial and had furthered the goals of the Clean Air Act.

As the Court of Appeals recognized in this case, § 307(f) requires the court to consider the importance, novelty, and complexity of the issues raised by the party seeking fees and costs.  A fee award might well be inappropriate if the party had challenged an agency decision of narrow applicability,[28] or if the party's contentions, though nonfrivolous, were relatively weak.  In addition to the importance of the issues litigated by the party seeking attorney's fees, it would be appropriate for the court to consider whether the party had an economic incentive to participate in litigation because it stood to gain substantial economic benefits.  If so, an award of fees would be inconsistent with congressional intent.  Further, § 307(f), properly construed, permits the court of appeals to take into account the degree of technical and legal assistance the party provided to the court in its evaluation of the case. The court of appeals is in the best position to make these determinations, because it is uniquely familiar with the circumstances of each case.  In order to assure a reasonable exercise of discretion, it should be required to explain with some care—as the Court of Appeals has done in this case— why it deems an award of fees to a nonprevailing party to be "appropriate."

Regardless of our views about the wisdom of the choice Congress made, we have a plain duty to accept it.  *TVA* v.

---

[28] Section 307 applies not only to nationwide rules imposing potential costs of billions of dollars, such as the sulfur dioxide standards in this case, but also to a variety of other regulations, revisions of regulations, implementation plans, and orders. 42 U. S. C. § 7607(d)(1) (1976 ed., Supp. V).

*Hill,* 437 U. S. 153, 194–195 (1978).   Congress consciously selected a particular course: that a party who seeks judicial review of an EPA regulation may be entitled to compensation from the Government, when the court deems it "appropriate," even if the reviewing court determines that there is no ground for disturbing the agency's conclusions.   I would construe this category of "appropriate" cases to be narrow; it is wrong, however, to read it out of the statute altogether.   It is not the function of the courts to "sit as a committee of review, nor are we vested with the power of veto."   *Ibid.*[29]

I therefore respectfully dissent.

---

[29] This case is the mirror image of *Alyeska Pipeline,* where we noted that "it is not for us to invade the Legislature's province by redistributing litigation costs in the manner suggested by respondents . . . ."   421 U. S., at 271.   Here, it is not for us to invade the Legislature's province by refusing to distribute litigation costs in the manner clearly contemplated by the 95th Congress in 1977.