**BIODIVERSITY LEGAL FOUNDATION and Marie Morrissey, Plaintiffs,**

v.

**Bruce BABBITT, Secretary of the Interior, and John Rogers, Acting Director of the United States Fish and Wildlife Service, Defendants.**

No. CIV.A. 96–B–2951.

United States District Court,
D. Colorado.

Sept. 21, 1999.

Neil Levine, Earthlaw, University of Denver–Forbes House, Denver, CO, for Plaintiffs.

Eileen Sobeck, Richard A. Monikowski, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, DC, Teri R. Thomsen, U.S. Dept. of Justice, Wildlife & Marine Resources Section, Washington, DC, for Defendants.

## ORDER

BABCOCK, District Judge.

In this citizen suit to enforce the Endangered Species Act, 16 U.S.C. § 1531, *et seq.* ("ESA"), Plaintiffs, Biodiversity Legal Foundation and Marie Morrissey (collectively "Plaintiffs"), move for costs and attorney's fees pursuant to 16 U.S.C. § 1540(g)(4). The issues are adequately briefed and oral argument will not materially aid their resolution. For the reasons set forth below, I deny the Plaintiffs' motions. Jurisdiction over this action is proper in this Court pursuant to 28 U.S.C. § 1331, original federal question jurisdiction.

### I.

The following facts and procedural history are relevant to my determination of the motions before me. On October 5, 1995, Plaintiffs filed an ESA petition to list the Lesser Prairie–Chicken (*Tympanuchus Pallidinctus*) (the "Chicken") as an endangered species. According to the ESA, Defendants were to make a preliminary, 90–day finding on the petition by January 4, 1996, and a 12–month finding by October 6, 1996. 16 U.S.C. § 1533(b)(3)(A) & (B). Plaintiffs filed this action on December 23, 1996, alleging that Defendants, Bruce Babbitt, Secretary of the Interior, and the Director of the United States Fish and Wildlife Service (collectively "FWS" or "Defendants"), violated the ESA by failing to make the requisite 90–day finding on the Chicken petition, and requesting the Court to compel such a finding.

On July 8, 1997, after the parties filed cross-motions for summary judgment but before this Court set a hearing date, the FWS published its 90–day finding on the petition to list the Chicken as a threatened species, mooting the initial action. On September 15, 1997, Plaintiffs filed an Amended Complaint to compel the FWS to make the required 12–month finding. In October 1997, the parties again filed cross-motions for summary judgment. As with the 90–day claim, before this Court set a hearing on the motions, the FWS made the 12–month finding in which it found that listing of the Chicken as a threatened species was warranted but precluded by other higher priority actions. As a result, the parties dismissed the lawsuit on September 17, 1998. This Court retained jurisdiction to resolve the costs and attorney's fees issue.

### II.

As additional background to the FWS' delay, on April 10, 1995, six months before the FWS ever received the Plaintiffs' Chicken petition, Congress enacted Public Law 104–6 which rescinded 1.5 million dollars of the FWS' listing funds. The law also prohibited the use of appropriated funds to complete final listing or critical habitat designations. 61 Fed.Reg. 24722. The effect of the moratorium "was essentially to shut down the listing program."

61 Fed.Reg. 24722. Therefore, from October 1, 1995 to April 26, 1996, the Department of the Interior ("DOI") operated without an appropriations bill. Instead, DOI was appropriated reduced funding and was governed by "continuing resolutions," all of which continued the moratorium on species listing and critical habitat designation. Although Public Law 104–6 and subsequent legislation did not prohibit completion of preliminary listing determinations, "the funds provided for the remaining listing activities were so small that the Service was forced essentially to shut down the listing program." (Opposition Brief, p. 6).

On April 26, 1996, Congress enacted an appropriations bill for the DOI. The legislation empowered President Clinton to waive the moratorium, which he immediately did. At the time the moratorium lifted, the FWS had a backlog of 243 species that had been proposed for listing as endangered or threatened. 61 Fed.Reg. 24722. Many of these 243 outstanding proposals were overdue. *See Sierra Club v. Babbitt,* 948 F.Supp. 56 (E.D.Cal.1996) (noting that there were more than 200 species whose listing status had been pending for over one year):

> Significant obstacles remain as the Service restarts its listing program. The available funds fall far short of what is needed to clear away the backlog that has built up. Currently the Service faces a backlog of 243 proposed species, a far larger backlog than has existed in recent times. This poses a particularly difficult problem for the Service in light of the other Section 4 activities that require attention such as resolving the conservation status of 182 candidate species (see 61 FR 7596; February 28, 1996); addressing pending court orders; and resolving petitions for 57 species. This highly irregular situation demands that the Service establish biologically defensible work priorities to guide expenditures of the limited listing appropriations in a manner that best serves the purposes of the Act.

61 Fed.Reg. 24722. In order to process the backlog of petitions, the FWS developed a Listing Priority Guidance ("LPG") to govern the allocation of the limited funds for the administration of the ESA's nationwide listing program. 50 C.F.R. Part 17, 61 Fed.Reg. 64475 (Dec. 5, 1996). The LPG is a biologically-based method of prioritizing petitions in a tiered system intended to produce the greatest conservation benefits to the most imperiled species. Because the funding for the ESA listing program was restored in April 1996, the Defendants continued to administer available funds according to the LPG to complete the remaining backlog of petitions within a reasonable time. The processing of findings on petitions, such as the one at issue in this case, was listed as a Tier 3 priority under the LPG. The LPG directed the FWS to begin processing Tier 3 actions once Tier 2 determinations were underway. The FWS specifically declined to elevate the priority of a proposed listing for a species simply because that species was the subject of litigation. 61 Fed.Reg. 64480.

> The Service will not elevate the priority of proposed listings for species under active litigation. To do so would let litigants, rather than expert biological judgments, set listing priorities. The Regional Office with responsibility for processing such packages will be responsible for determining the relative priority of such cases based upon this proposed guidance and the 1983 listing priority guidelines, and for furnishing supporting documentation that can be submitted to the relevant court to indicate where such species rank in the overall priority scheme.

61 Fed.Reg. 64480.

Within this context, on October 5, 1996, six months after Congress enacted the listing moratorium, the Plaintiffs submitted their petition for the listing of the Chicken as a threatened or endangered species. Approximately one month after Congress effectively ended the moratorium, Plain-

tiffs sent a 60–day notice of Intent to Sue for failure to meet the 90–day finding requirement. On December 23, 1996, the Plaintiffs filed a Complaint for Injunctive and Declaratory Relief, seeking to force Defendants to make the 90–day finding. On April 15, 1997, Plaintiffs filed their motion for summary judgment. In the Defendants' response to the motion, they included a declaration of Jamie Rappaport Clark, director of the FWS, giving an approximate deadline, in accordance with the LPG schedule, for future action on the petition. The 90–day finding was eventually published within one week of this estimated deadline.

## III.

■ The ESA citizen suit provision provides that courts, "in issuing any final order ... may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 16 U.S.C. § 1540(g)(4). The Supreme Court has interpreted identical language in the citizen suit provision of the Clean Air Act as allowing fees only when a party achieves "some degree of success on merits." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983). Parties are deemed to prevail for the purposes of an award of attorney's fees if they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Colorado Environmental Coalition v. Romer*, 796 F.Supp. 457, 459 (D.Colo. 1992).

A plaintiff can be a prevailing party in the absence of a judicial determination on the merits. *Foremaster v. City of St. George*, 882 F.2d 1485, 1488 (10th Cir. 1989), cert. denied, 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); *Colorado Environmental Coalition*, 796 F.Supp. at 459. Under these circumstances, the Tenth Circuit employs a "catalyst" test which requires a plaintiff to show, "(1) that the lawsuit is causally linked to securing the relief obtained, and (2) that defendant's conduct in response to the lawsuit was required by law." *Id.* To satisfy the first prong of this test, "[t]he lawsuit need not be the only reason for the defendant's changed conduct, but it must be a 'substantial factor or significant catalyst.'" *Colorado Environmental Coalition*, 796 F.Supp. at 459 (citing *Foremaster*, 882 F.2d at 1488); *see also, Luethje v. Peavine School Dist.*, 872 F.2d 352, 354 (10th Cir. 1989) (defendant's change in policy was "to quell the disharmony caused by plaintiff's complaints").

■ The Supreme Court has held that when determining whether attorney's fees are appropriate against the United States, the statute providing for such awards must be strictly construed. In *Ruckelshaus*, the Court stated that, "[e]xcept to the extent it has waived its immunity, the Government is immune from claims for attorney's fees .... Waivers of immunity must be 'construed strictly in favor of the sovereign,' and not 'enlarge[d] ... beyond what the language requires.'" 463 U.S. at 685, 103 S.Ct. 3274 (internal citations omitted).

## IV.

Plaintiffs argue that they are the prevailing party for purposes of attorney's fees. Defendants argue that Plaintiffs were not the catalyst for the 90–day and 12–month determinations because Defendants would have published these decisions according to the LPG with or without a lawsuit.

### A. 90–Day Determination

■ The Plaintiffs' initial Complaint addressed the Defendants' failure to meet the 90–day requirement under the ESA. 16 U.S.C. § 1533(b)(3)(A). After the FWS completed the 90–day determination, the Plaintiffs filed a Motion for Costs Including Attorney's Fees in September 1997. The Plaintiffs characterize the Defendants' eventual 90–day determination as follows:

Plaintiffs achieved their desired outcome when Defendants signed and submitted the 90–day finding to the Federal Register in an attempt to avoid the impending motions' hearing. The timing and chronology of Defendants' action demonstrates that were it not for Plaintiffs' lawsuit, the FWS would not have acted in accordance with the ESA and made its required finding.

(Plaintiffs Motion for Costs Including Attorney's Fees, p. 5–6) (citing *Colorado Environmental Coalition,* 796 F.Supp. at 459, holding that the "timing and chronology" of events can be considered in the catalyst determination). The Plaintiffs go on to argue that the second prong of the catalyst test is also met because timely action on the Chicken petition was required by the ESA. The ESA states:

> *To the maximum extent practicable,* within 90 days after receiving the petition of an interested person ... the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted.

16 U.S.C. § 1533(b)(3)(A) (emphasis added).

Although Defendants strenuously argue that Plaintiffs do not meet the first prong of the catalyst test (i.e. that the lawsuit is causally linked to securing the relief obtained), I do not address that prong because the second prong (i.e. that defendant's conduct in response to the lawsuit was required by law) is not met. Section 1533(b)(3)(A) does not impose a mandatory, absolute 90–day deadline for the Defendants to make a preliminary determination. The plain language of this provision qualifies the 90–day period with the language, "[t]o the maximum extent practicable."

In a separate action by the Plaintiffs against the Defendants to compel the determination of the listing of the Columbian Sharptailed Grouse, a court in this district held that such a 90–day determination was not required by law. *See Biodiversity Legal Foundation, et al v. Babbitt, et al,* Civil Action No. 95–S–2575 (D.Colo. February 24, 1997) ("In its role to ensure that important legislative purposes are not lost in the federal bureaucracy, the court cannot conclude that the Defendants' failure to act within the 90–day period set forth in the ESA and its accompanying regulations is a violation of the ESA, its regulations, or the APA."). Congress has authorized the Defendants to use a priority system to list and delist species under the ESA:

> The phrase "to the maximum extent practicable" addresses the concern that a large influx of petitions coupled with an absolute requirement to act within 90 days would force the devotion of staff resources to petitions and deprive the secretary of the use of those resources to list a species that might be in greater need of protection.... The listing agencies should utilize a scientifically based priority system to list and delist species, subspecies and populations based on the degree of threat, and proceed in an efficient and timely manner.

1982 U.S.C.C.A.N. 2860. In addition, the plain language of the provision requires the Defendants to make the 90–day finding only "to the maximum extent practicable." 16 U.S.C. § 1533(b)(3)(A). "By including this exception, Congress explicitly provided the Defendants with discretion in making the petition findings. According to the plain language of the ESA, the making of petition findings is subject to practicability." *Biodiversity,* Civil Action No. 95–S–2575. Because of the unusual circumstances of the listing moratorium and the resulting LPG, I hold that Defendants were not "required by law" to meet the 90–day deadline. *Foremaster,* 882 F.2d at 1488.

Accordingly, I conclude that the Tenth Circuit's catalyst test prohibits Plaintiffs from collecting attorney's fees and costs for the 90–day determination because the Defendants' actions were not "required by law." Therefore, I need not reach the

issue of the "reasonableness" of Plaintiffs' requested fees and costs.

## B. 12–Month Determination

■ In response to the publication of the 90–day determination, the Plaintiffs amended their Complaint in September 1997 to compel the Defendants to make the 12–month finding under the ESA. When the ESA eventually made the 12–month finding, the Plaintiffs again moved for costs including attorney's fees. Again, the first prong of the catalyst test requires a plaintiff to prove that the lawsuit was causally linked to securing the relief obtained. *See Foremaster*, 882 F.2d at 1488; *Colorado Environmental Coalition*, 796 F.Supp. at 459. "The lawsuit need not be the only reason for the defendant's changed conduct, but it must be a 'substantial factor or significant catalyst.'" *Colorado Environmental Coalition*, 796 F.Supp. at 459 (citing *Foremaster*, 882 F.2d at 1488).

Plaintiffs' Amended Complaint sought to compel the 12–month finding on the Chicken petition. Plaintiffs argue that they achieved their litigation goals when the Defendants published the 12–month finding in June 1998:

> Plaintiffs' lawsuit was a "substantial factor" in forcing the FWS to publish its 12–month finding for the Lesser Prairie Chicken petition. The FWS took action in direct response to the suit. Before Plaintiffs filed, the Lesser Prairie Chicken petition had languished in the FWS's office for two years. FWS had more than sufficient time to take actions before Plaintiffs were forced to resort to legal action... There is no indication from past performance that FWS would have acted absent the lawsuit. Plaintiffs' lawsuit served as the catalyst to achieve the desired outcome.

(Plaintiffs' Motion for Costs Including Attorney's Fees, p. 5). In response, the Defendants argue that they prepared and adhered to the LPG timetable, created in response to the funding moratorium and subsequent backlog. The LPG was developed independently of Plaintiffs' action,

and thus Plaintiffs' action was not a catalyst.

I conclude that the Plaintiffs' action was not the "catalyst" or "substantial factor" in the Defendants' determination of the Chicken petition. As outlined above, the funding moratorium forced the Defendants into the unusual situation of having to forfeit the 90–day and 12–month deadlines established under the ESA. *See, e.g., Biodiversity Legal Foundation*, Civil Action No. 95–S–2575 (detailing the moratorium and resulting delays). Because of the moratorium, the LPG was established to prioritize the resolution of the 243 pending petitions. Although the moratorium and resulting LPG may not excuse the delays, I cannot find that the Plaintiffs' suit was the reason for the eventual publication of the 12–month determination. Defendants have shown that the timing of this determination was the result of scheduling pursuant to the LPG. Therefore, Plaintiffs were not the catalyst for this determination.

In December 1996, in light of the moratorium, delays, and resulting litigation, the United States Fish and Wildlife Service made a telling statement with regard to LPG priorities: "The Service will not elevate the priority of proposed listings for species under active litigation. To do so would let litigants, rather than expert biological judgments, set listing priorities." 61 Fed.Reg. 64480 (Dec. 5, 1996). In accordance with this statement, the FWS has remained true to the LPG. It has not allowed litigants to serve as catalysts.

The Plaintiffs filed this action in December 1996, seeking to compel the initial 90–day determination. In this same month, the Federal Register published the "Endangered and Threatened Wildlife and Plants; Final Listing Priority Guidance for Fiscal Year 1997," 50 C.F.R. Part 17, 61 Fed.Reg. 64475 (Dec. 5, 1996), in which the FWS set forth its tiered levels of prioritization of pending matters. "The continuing ... backlog and the funding shortfall underscore the need to

maintain program-wide biologically sound priorities to guide the allocation of limited resources." *Id.* at 64476. "[T]he Service has instituted this guidance to provide a reasonable means for prioritizing actions.... [T]he Service hopes to promote public and judicial understanding of the bind in which the Service finds itself and the reasonableness of its approach." *Id.* at 64478. The FWS, therefore, set forth a multi-tiered approach that assigns relative priorities to listing actions. *See id.* The 90–day and 12–month listing determinations were assigned Tier 3 priority. The regulations state that, "[a]s the Regional offices near completion of their pending Tier 1 and 2 actions, they will be expected to begin processing Tier 3 actions. Each Region should begin processing Tier 3 actions once all Tier 2 determinations are underway and near completion ...." *Id.* at 64480.

In accordance with these national regulations, the Defendants attached FWS declarations to both of their summary judgment briefs. The first such declaration described the moratorium and the LPG and its respective tiers. It gave an anticipated date by which the 90–day determination was to occur. (Exh. 1 to Defendants' Opposition to Plaintiffs' Motion for Costs). On March 10, 1997, the Defendants sent the Plaintiffs the March 5, 1997 directive to the field offices outlining priorities for listing activities. (Exh. 2 to Defendants' Opposition to Plaintiffs' Motion for Costs). Further, in response to Plaintiffs' second motion for summary judgment, Defendants submitted a second declaration. This declaration again outlines the circumstances surrounding the delay and moratorium and, with reference to the LPG, estimates that the 12–month finding will be completed by April 8, 1998. The determination was finally published on June 9, 1998. 63 Fed.Reg. 31400.

I conclude that the FWS would have made its June 1998, 12–month Chicken determination regardless of Plaintiffs' initiation of this action. The Plaintiffs argue that the timing and chronology of events leading up to the 12–month finding demonstrate that Plaintiffs' suit was a catalyst to agency action. However, chronology without a causal relationship is not enough. Plaintiffs have failed to prove such a relationship. The FWS has shown that the reason for both the delay and eventual action by the FWS is the LPG timing guidelines. I find and conclude, therefore, that the Defendants' actions were taken independent of this lawsuit. The declarations, letters from the agency, and Federal Register all show that the Defendants were acting in accordance with an established plan. Because Plaintiffs have not met the first prong of the test, I need not reach its second prong or the reasonableness of the proposed fees. Therefore, I hold that Plaintiffs are not the "prevailing party" for purposes of costs and fees in either the action to compel the 90–day determination or the action to compel the 12–month determination.

Accordingly, I ORDER that:

(1) Plaintiffs' September 29, 1997 Motion for Costs Including Attorney's Fees is DENIED; and

(2) Plaintiffs' October 14, 1998 Motion for Costs Including Attorney's Fees is DENIED.